320 So.2d 697

**Johnny Lee CRONNON**

**v.**

**STATE.**

**7 Div. 340.**

Court of Criminal Appeals of Alabama.

June 30, 1975.

Rehearing Denied July 29, 1975.
Certiorari Denied Jan. 19, 1976.
See 96 S.Ct. 864.

Myron K. Allenstein, Gadsden, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, and Frank L. Thiemonge, III, Asst. Attys. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and sentenced to life imprisonment in the penitentiary. At arraignment and throughout the trial, he was represented by counsel. He pleaded not guilty. After conviction he was furnished a free transcript and trial counsel represented him on appeal.

On the night of April 11, 1974, Jeanne Marie Aiello, a fifteen-year-old girl residing at 104 Oakleigh Drive, Gadsden, Alabama, was stabbed to death about ten miles north of Gadsden. Her nude body was found early the next morning lying along side Interstate 59. An autopsy was performed by Mr. Vann Pruitt, Assistant State Toxicologist in charge of the Huntsville Division. The autopsy revealed that she had been raped as spermatozoa was found in her vagina. There were fourteen (14) stab wounds mostly in the area of her breasts, and she had been struck on the head with a blunt-type instrument. According to Mr. Pruitt's opinion, the blow to her head was probably an hour prior to the stab wounds, reasoning, "in order for the degree of swelling and hemorrhage to develop underneath the scalp with the heart beating as opposed to being post-mortem." He further described his autopsy findings:

"The body was that of a Caucasian female which measured in length 5 feet 7¼ inches. I estimated the weight as being approximately 175 to 185 pounds. The eyes were hazel. The hair was light brown, and it was a young person consistent with the identified 15 years of age. There were no outstanding identifying scars, tattoos or amputations of any of the extremities. The body was unclothed with the exception of a white canvas shoe which was present on the left foot, and about the neck was a gold St. Christopher's medal on a chain. The body was heavily soiled with bloodstains and debris. I made note of the following injuries to the

body, and the order in which I describe these injuries does not infer that was the order that they were sustained but merely the order in which I made notes of them: injury number one consisted of a stab wound measuring one inch in its length which was located in the right shoulder two inches above the armpit. Number two was a penetrating stab type wound measuring one inch was located in the right shoulder 1½ inches on the axilla, or armpit. Number three was a stab type penetrating wound measuring 1¼ inches in length located in the right chest 4 inches over the common horizontal line of the nipples and 5 inches to the right of the midline of the body. Number 4 was a stab type penetrating wound measuring ¾ of an inch in its length located in the right upper chest 4½ inches over the common horizontal line of the nipples and 3 inches to the right of the midline. Number 5 was a penetrating stab type wound measuring 1 inch in length located in the left chest 3 inches to the left of the midline and 5 inches above the common horizontal line of the nipples. Number 6 was a penetrating stab type wound located in the left upper chest 4 inches to the left of the midline of the body and 3½ inches above the common horizontal line of the nipples.

'Q. Excuse me for interrupting, Dr. Pruitt, what is—you keep saying a penetrating stab type wound, could you give us the amount or degree of penetration we are referring to when you say these are penetrating stab type wounds? How deep, in other words, in centimeters or inches?

"A. There was some degree of variation at approximately 4 inches penetration depth being the maximum, some were more superficial than others.

"Q. You would say then that these stab type wounds you have been referring to as 4 inches would be the maximum depth?

"A. Yes, sir.

"Q. Approximately?

"A. 4 inches.

"Q. Thank you. Go ahead, I'm sorry.

"A. Wound number 7 was a penetrating stab type wound in the left chest 2 inches above the common horizontal line of the nipples and 3 inches to the left of the midline of the body. Number 8 was a superficial laceration, or cut, on the outer left forearm at the wrist. Number 9 was a laceration, or cut, on the ulnar surface of the left hand. That would be the surface on the base of the little finger, being the ulnar surface. Number 10 was a laceration, or cut, measuring ¾ of an inch to the pad of the left thumb. Number 11 was a penetrating stab type wound on the outer surface of the right upper arm 5 inches below the peak of the shoulder. Number 12 was a penetrating stab type wound ½ inches in length on the back of the right upper arm 2½ inches below the arm pit. Wound number 13 was a penetrating stab type wound measuring 1 inch located in the right back 1¼ inches to the right of the midline of the body and 1 inch above the common horizontal line of the axilla, or armpit. Number 14 was a 1¼ inch stab wound in the right back located 4 inches to the right of the midline and on the line of the armpit. Number 15 was a tear in the top crown of the head which measured 1¼ inches. There were two other superficial tears in the right side of the head, one being at the temple and the other one being in the forehead at the hairline. There were abrasions generally about the torso and extremities. These would conclude the wounds that I made note of as being present from the examination of the body externally.

"Q. Now, could you be a little bit more—amplify more specifically the cranial portion of the body? I am sure you examined it.

"A. Yes, sir. The laceration to the top of the head which I have described as being a 1½ inch tear in the top crown of the head and two superficial tears, one being in the temple and the other being at the forehead hairline on the right side, had somewhat irregular edges with the hair follicles somewhat protruded which would tend to indicate blows sustained to the head as opposed to an injury from a bladed type instrument such as a cutting instrument. It would be of a blunt force type of trauma. It did not fracture the skull, and examination of the brain failed to show evidence of any apparent injury there. It was a blunt force trauma or blow sustained to the head."

\*   \*   \*   \*   \*   \*

"The numerous stab wounds which I have described which caused injury to several major areas of the body. One, a complete severing of the subclavian artery, penetration of the right lobe, penetration of the left lobe, and penetration of the pulmonary artery of the heart, penetration of the right atrial of the heart, these would be the primary injuries resulting in extensive hemorrhage which would in my judgment would have caused death."

Mr. Pruitt did not view the body until 12:45 P.M. on April 12. Estimated time of death was 12 hours before that time—give or take a couple of hours either way.

There were no eye witnesses to this crime and the state had to rely on circumstantial evidence. Appellant offered alibi evidence.

Around 8:55 P.M. on April 12, 1974, the stepfather of the deceased sent her to the C-Mart Grocery Store to buy a loaf of bread, some butter, and some ice cream for her and the smaller children. The C-Mart was several blocks from her home. The victim had a small black dog with a white chest and this dog went with her to the store. Across the street from the C-Mart was the Zippy-Mart. Both grocery stores were located on the Centre Highway.

At 9:15 P.M. that same night the stepfather heard a commotion outside his house and went out to investigate. He found the victim's dog chasing a neighbor's cat. He realized something was wrong as the dog had returned home alone. He got in his pick-up truck and made several trips to and from the C-Mart in search of the girl. Failing to find her, he reported her missing to the authorities.

At 9:00 P.M. that night Mr. Donovan Hawthorne drove his wife to the Zippy-Mart to do some shopping. He stayed in the car while his wife went in the store. He was asked what he observed while parked in front of the store, and he testified as follows:

"A. And we pulled up to the Zippy Mart and my wife got out and went inside. And there was this—no more than got there than this girl come walking by on the left side of us, and this little dog was following her. So, she had no more than got out—I guess got back beside of me—I quit looking at her when she got to the right side of me and I noticed the dog. And she no more than got out of sight, I imagine she had time, maybe, to get across the highway, or maybe on this side of the highway, one, and so she walked—must have went across the road or something—then about this time this car come pulling up, this white '66 Impala, two door Super Sport, with a loud muffler, and I noticed the guy got out, and he walked up in—in front of me—or across, nearly in front of me and went in the

door and he had a tattoo of a naked woman on the left inside of his arm, and he was walking swinging his arms is the reason I noticed the tattoo. He was blonde headed, and his hair come down nearly almost to his shoulders. Well, he walked in—went in the front—went down in front and went over to the bookstand and turned around and looked out the window, walked back across and down in front of the counter and around toward the back and turned around and come back around to the peanut stand and picked up a bag of peanuts and bought them and come out. Well, he come out, and I thought he was going to his car. I had the kids out there so I was just turned around and paying attention to them, and I didn't hear him crank up or nothing in a little bit, and I looked and he wasn't over there. So, in the meantime, this girl and dog had came back across the road and walked down through there, and I turned my head again, and started playing with the kids. Well, in a little bit I heard his car crank up and I looked back over there and he pulled off down beside the Zippy Mart, down that little road. In the meantime, my wife had bought the stuff and she was coming back out to the car, and we started to leave, and the car came back out at a pretty high rate of speed and almost run into us. I had to mash the accelerator to get out of the way. And the car went toward—come toward Gadsden.

"Q. Now, this man that you saw on that occasion, is he present in the courtroom?

"A. Yes, sir.

"Q. Would you point him out to the Court and Jury?

"A. (Thereupon, Mr. Hawthorne indicated that Mr. Cronnon was the man.)

"Q. Let the record show that he point to the man that's in the brownish rust shirt—sports shirt. Is that him?

"A. Yes, sir.

"Q. Now, let me understand it. First, the girl, you saw her with a dog—came by on the side of the Zippy Mart, is that correct?

"A. Come—well, out from me a little piece.

"Q. And you noticed her with a dog. Did she have anything in her arms?

"A. No, sir, not when she was going. She did when she came back across the road, she had a sack in her arms.

"Q. Sack in her arms. Came back across the road and then you observed this Defendant, you say, Johnny Cronnon, come out of the store, the Zippy Mart?

"A. Yes, sir, after she had—well, he had pulled up when she was going across the road, I suppose, I didn't see her until she got beside of me.

"Q. But she had a sack in her arms, she went back to the back.

"A. Coming back.

"Q. Coming back, she walked beside the Zippy Mart going down the dirt road beside the Zippy Mart, is that correct?

"A. Yes, sir, between the Zippy Mart and the dirt road, somewhere in there.

"Q. Then you observed the accused, Johnny Cronnon, come out of the Zippy Mart?

"A. No, sir, he came out before she came back across the road.

"Q. All right. When he came out, where did he go?

"A. He went toward his car, that's when I didn't look at him no more.

And I looked over there in a minute and he wasn't in the car.

"Q. But he had been in the Zippy Mart?

"A. Yes, sir.

"Q. Came out of the Zippy Mart, towards his car, and then the girl crossed the road again, came back, going back home down the road?

"A. Yes.

"Q. And then what did you observe the Defendant do?

"A. Well, I heard his car crank up, and looked over there, and he was in it driving down that road.

"Q. You mean the same direction she had gone?

"A. Yes, sir.

"Q. How much longer after she had gone down that dirt road beside the store was it that the Defendant went down there in his car following her down there?

"A. About two minutes—a minute or two minutes.

"Q. All right. Now, let me ask you, Mr. Hawthorne, did this Defendant ever follow on foot the Defendant, or was he in the car going down the dirt road that he followed her? (sic)

"A. I couldn't tell from where I was sitting. He come back, or he got in his car, and drove down there and then he came back.

"Q. All right, sir. He came back but he came back from having been on the side with her, is that right, the same direction?

"A. About the same direction right there, but he might have been on the dirt road.

"Q. What I'm saying, was he ever on foot following her down the dirt road there?

"A. I don't know, I couldn't see.

"Q. I see. But you did observe him in the car follow her down there, is that correct?

"A. I don't know whether he followed her down there in the car or not, but he went down there and turned around and came back in just a little bit.

"Q. About two minutes, you say?

"A. About a minute.

"Q. And he was going at a very high rate of speed when he came back and headed towards Gadsden?

"A. Pretty good, pretty fast.

"Q. Now, how well was this lighted up in front of the Zippy Mart? Well lit, poorly—

"A. Fair, fairly well lit up.

"Q. The lights out in front of it, sir?

"A. Yes, sir.

"Q. And I believe you said you observed a tattoo on the forearm of a naked woman?

"A. Yes, sir.

"Q. Of this Defendant?

"A. Yes, sir.

"Q. Because he was swinging his arms?

"A. Yes, sir.

"Q. And when did you observe that tattoo, sir?

"A. Right before he went in the door.

"Q. To go in the Zippy Mart, sir?

"A. Yes, sir.

"MR. RAYBURN: Mark this as State's Exhibit Number 11.

"(Whereupon, State's Exhibit Number 11 was marked for identification.)

"Q. I'd like for you to look at State's Exhibit Number 11, sir. Is that the car you have been testifying about, sir?

"A. Yes, sir, looks just like it.

"Q. Fair and accurate picture of the car you have been testifying about?

"A. Yes, sir."

On cross-examination this witness testified that he did not call the Gadsden Police Department until he heard about the missing girl on the radio the next morning. He said if the radio report had not mentioned a girl with a dog he would not have thought anything about what he had observed the night before. He talked to some sergeant who asked him to come to the department and he went by that afternoon and signed a written statement about what he saw the night before. He described the man he saw that night as having long blonde hair with dark streaks running through it, very thin sideburns, and a light mustache. His hair was considerably lower than his collar.

Hawthorne further testified that the police brought two sets of photographs to his home and he was unable to identify the man he saw at the Zippy-Mart on April 11, 1974. Two months later while Hawthorne was in summer camp at Camp Shelby, Mississippi, the officers brought him another set of photographs or mug shots and he identified appellant without hesitation. As above quoted, Hawthorne made a positive in-court identification of appellant.

Mr. Roy McDowell, an investigator for the Sheriff's Department, testified that he went to the scene of the crime shortly after the body of the victim was discovered and before the body was removed. According to his testimony the killing occurred at a point on a high bluff—75 to 100 feet above the southbound lane of Interstate Highway 59. There was a flat space on the bluff about 30 by 20 yards wide. He found the weeds mashed down and two pools of blood and the victim's clothing. He described the clothing as follows:

"A white brassiere with blood on it, there was a blue windbreaker, and one pair of blue slacks with a white leather belt, and a pair of panties and one red blouse."

He further testified that the windbreaker and slacks had blood on them. The clothing had not been mutilated or cut indicating that she was not clothed at the time she was stabbed.

Mrs. Rosemary Freeman testified for the state. She said appellant was her husband's first cousin and had been living in their house two or three weeks prior to April 11, 1974. They lived at 410 Carolyn Lane in the Oakleigh Estates in North Gadsden. Appellant was not employed during the time he lived with them but at times rode with her husband who was an exterminator. She did not see appellant during the day of April 11th, but heard him come in the house around 10:00 P.M. He slept on the couch in the livingroom and she heard him turn on the television set. Her husband and her sister had gone to a movie and got home between 11:30 and 12:00 P.M. When they came in,

she got out of bed and all of them went in the kitchen including appellant. She noticed a ten-pound bag of potatoes and a bag of pistachio nuts. She asked appellant where he got the potatoes and he told her he bought them from a peddler who was selling fruits and vegetables. She asked him about the pistachio nuts and said, "I didn't know you liked pistachio nuts," and he said, "Yeah, I like them." She said he said he got them at the store and she assumed that is where he bought them.

She further testified that appellant had a green shirt and tan pants and she noticed a superficial scratch on one of his arms. She left for work a little after six o'clock the next morning. She walked through the livingroom and saw appellant asleep on the couch without a shirt on and she noticed long scratches on both of his arms and a tattoo of a nude lady on his left arm. She further stated that appellant did not have scratches on his arms prior to the night of April 11th.

She described appellant as having long hair, long bangs—fluffy brassy color or reddish blonde; that he had an old Chevrolet that was an off-colored white with a Tennessee tag. The Chevrolet automobile did not have a muffler and made a loud noise. She said that appellant did not live with them after April 12, 1974; that he left their home on that date and went to Tennessee to get his income tax refund check and the next time she saw his car, it had an Etowah County tag on it. A few days later he traded his car for a Chrysler automobile.

This witness said she saw appellant a few days after he left their home and he had shaved off his mustache and had colored his hair a light brown.

Mr. Wesley Freeman, appellant's first cousin, testified for the state and corroborated the testimony of his wife in every respect. In addition to this, he testified that about two weeks before the girl was killed, appellant borrowed a knife from him; that the blade of the knife was about $4\frac{1}{2}$ inches long and he had not seen the knife since he loaned it to appellant. He further testified that the muffler on appellant's car had a hole in it and it made a loud noise.

Mr. L. P. Payne, an investigator for the district attorney's office, testified that he drove his automobile from the Zippy-Mart to the place where the girl's body was found and that it took him 19 minutes to go and 18 minutes to return; that he stopped for all red lights and drove faster when he got on Interstate 59.

Mrs. Edwin Cochran testified that on the day of the girl's funeral, a man answering appellant's description stopped at the Arco Service Station operated by her, her husband, and son and asked her for directions to the Collier-Butler Funeral Home. She asked him if he had a relative there and he said that he did not, that it was a friend. She further testified that, "He said it was the girl who was murdered and he just wanted to pay his last respects." She said the man had long hair and it was a bleached color and he was driving an old dirty white Chevrolet. She identified appellant at his trial as being the man that stopped at the service station on the day of the funeral.

Appellant was arrested on June 17, 1974. He was given the *Miranda* rights and warnings. He refused to sign a waiver of rights form but he did give the officers a written statement which was exculpatory in nature.

This statement was not admitted in evidence until the state took the testimony of two rebuttal witnesses. However, in order

to better understand the theory of the prosecution, we think it wise to set out this statement at this time. The statement is as follows:

"STATE'S EXHIBIT NUMBER 23

"VOLUNTARY STATEMENT
(Under Arrest)

"DATE 6–17–74 TIME 4:30 P.M. PLACE Etowah Co. Sfheriff's (sic) Office

"I, Johnny Lee Cronnon, am 33 years of age and my address is Route #1, Chickamauga, Georgia. I have been duly warned by Roy McDowell, who has identified himself as County Investigator, that I do not have to make any statement at all, and that any statement I make may be used in evidence against me on the trial for the offense concerning which this statement is herein made. Without promise of hope or reward, without fear or threat of physical harm, I freely volunteer the following statement to the aforesaid person:

"I have been living with my father Clarence Cronnon, Route #1, Chickamauga, Georgia about one and a half or two months. On the night of April 11, 1974, the night the Aiello gir (sic) was murdered I went to Ferns, (sic) a friend of mine that is kin to the Regans about 6:30 or 7:00 P.M. I did not stay long. A little after 7:00 P.M. I came to Irene Thompson's trailer off Alabama Street and 12th. I stayed about one and a half hours then I went to Mason's. I bought a chest set (sic) and 10 Lbs of Irish potatoes from a pedler (sic) out front while I was at Mason's. About 8:45 P.M. I left Mason's and went home. I went by the Zippy Mart on the Centre Hwy. and got home about 9:00 P.M. Rose Mary and the kids were there. Wesly came home about 11:30 or 12:00 P.M. and we went up to where the Rescue Squad was at the Zippy Mart. I was lying on the couch when Wesly came in. Me and Wesley went to the Zippy Mart, we talked to the boys on the rescue squad and the Highway Patrole. (sic) We were in Wesley's car. I did not stop when I went home from Mason's.

"I have read the 1 pages of this statement and the facts contained therein are true and correct.

"WITNESS: /s/ Roy McDowell  /s/ Johnny L. Cronnon

Signed by the arrested Party.

"WITNESS: /s/ Sgt C. Ray Beaird          Page 1 of 1 pages."

———◆———

Appellant testified in his behalf, and also offered the testimony of his mother, his step-mother, and his girlfriend.

His mother, Mrs. Gracie Wilkes, testified that on April 11, 1974, she lived at 2506 Norris Avenue, Alabama City, and that her son came to her house on that date at 6:30 P.M. and left at 20 minutes before 9:00 P.M. She could not remember how he was dressed but said he had long hair that came down to his shirt collar and bangs down to his eyebrows and he also had a mustache. She could not recall him having sideburns. She said a friend of hers, Mrs. Edith Dyer, was there that night also. When appellant left, he told her he was going to Wesley Freeman's.

On cross-examination, she was asked if her son mentioned to her that he was going to Fern's, a friend of his that was kin to the Reagans and she said that he did not; he said he was going to Wesley Freeman's. She said she knew Fern and knew he was kin to the Reagans. She was asked if he told her he had gone over to Irene Thompson's trailer off Alabama and 12th Street a little after 7:00 P.M. and stayed there for 1½ hours and she replied, "No,

he was at my house." She did admit she observed the tattoo of a naked woman on one of his arms.

Mrs. Bertha Cronnon, appellant's stepmother, testified that on April 11, 1974, she was living in Chickamuaga, Georgia; that appellant came to her house on Saturday night before Easter Sunday, which was on April 14, 1974. He had long orange-colored hair and she asked him to let her dye it for him. She and her daughter dyed his hair a light brown. She talked to him about getting his hair cut and gave him the money to pay for the hair cut. She said he had a light brown mustache but his sideburns were not very long.

On cross-examination she testified appellant was driving a 1966 Chevrolet and he had a Tennessee tag on the car; that he stayed there a day or two and then returned on April 18, 1974, and stayed with them until the officers picked him up. She said when he came back on April the 18th, he had a Chrysler automobile and he had shaved off his mustache.

Brenda Waddell, appellant's girlfriend, testified that she worked at the Village Inn, in Alabama City; that she had known appellant about six months and that on April 12, 1974, he came in the Village Inn. She described him as having blondish-red hair down to his neck and he had sideburns. She said he had a light brown mustache. She said he had scratches on his arms before April 12th. She knew about the tattoo of a naked woman on his arm.

On cross-examination she said she had been going with appellant about six months before the girl was killed; that when she was going with him he was driving a 1965 or 1966 Chevrolet car with a Tennessee tag on it. She said that within a week after the girl was murdered, appellant had dyed his hair brown and shaved off his mustache. She further testified that she learned of the girl's death on April 12th when appellant came in the Village Inn, and he was the person who told her about it.

Appellant testified that he was 33 years of age, 5 feet 7 inches tall and weighed about 135 pounds. On direct examination he freely admitted previous difficulties with the law, including two convictions of interstate transportation of stolen automobiles, petty larceny, armed robbery, burglary and grand larceny. He had been on parole a few months before the girl was killed, but at the time of the trial, his parole was revoked.

He further testified that he was presently married but was separated from his wife on April 11, 1974. He said he had a daughter by a previous marriage. He was asked about his activities on April 11, 1974, and said he had worked late at the Home Pest Control and then went to his mother's home. He said he left there at 8:35 or 8:40 P.M. and he stated:

"I left there at 8:35 or 40 and went to Meighan Boulevard and drove to Mason's Shopping Center by the river. It was—it was dark, I had went in and bought a chess set and checked on some Lewis Lamour westerns and I went back out front. There was a peddler in a pickup truck with fruits and things out there—I bought 10 pounds of bananas— or 10 pounds of potatoes, and 2 pounds of bananas for Wesley Freeman's children. And I drove—the carburetor on my car—the automatic choke was hanging up, and my car flooded out—which I had been setting it on fire and putting it out with a rag in order to crank it, but I didn't have nothing to put the fire out with that night, so I sat there about 15 or 20 minutes. And I drove from there to Wesley Freeman's house. Went in and put the things on the table and laid down on the couch and turned the TV on low and I dozed off to sleep and then Wesley Freeman and his wife come in and woke me up—or disturbed me and I woke up."

He further testified that he got a call from his parole officer and when he went to his office several police detectives came

in the office and told him he was under arrest. He said the officers kept him in a room and proceeded to read him his rights and asked him if he would give them a statement. They told him at that time what he was charged with and he gave them a signed statement. He admitted that he lied to the officers about going to Fern's and to Irene Thompson's trailer on the night of April 11th.

He further denied knowing the deceased and that he had not raped and killed her. He also denied that he went to the Zippy-Mart the night that the girl was reported missing.

He did admit that on the night of April 11, 1974, he was driving a 1966 Impala Chevrolet which was cream-colored and had a loud muffler. He also admitted having a tattoo of a nude woman on his arm and that he had dyed his hair a light brown and shaved off his mustache after April 12th. He further admitted that his Chevrolet had a Tennessee tag and that he bought an Etowah County tag two days before he traded his car for a 1966 Chrysler automobile.

On cross-examination he admitted that he was 33 years of age and had received felony sentences totaling 24½ years in the State and Federal prison systems. He further admitted borrowing a knife from his first cousin in March of 1974 but claimed he put it on the floorboard of his cousin's car. He claimed that he was doing some work on a house for Buddy Butler and that was how he got the scratches on his arms. He said the scratches went *around his arms* as opposed to going downward and the witnesses who so testified were just confused. He also denied that he went to Glencoe and had a conversation with Mrs. Cochran concerning the funeral of the girl that had been killed and told her the girl was a friend of his and that he just wanted to pay his last respects. He did admit that he went to the Village Inn on April 12th and told his girlfriend about the death of the girl.

The state called two rebuttal witnesses, viz., Willie Fern Wall and Roy McDowell, an investigator for the Sheriff's Department. Wall testified that he was presently living in Rome, Georgia, and had formerly lived in Walnut Park in Alabama City near Gadsden; that he had known appellant all of his life; that he recalled the occasion when the girl was missing from a point near the Zippy-Mart in north Gadsden and that it was on April 11th. He further testified that appellant did not come to his house the night the girl was missing, the night before, nor the night afterwards.

Mr. Roy McDowell testified that he advised appellant of his rights the night he was arrested by reading to him a card containing the *Miranda* rights, and that he asked appellant if he wanted to make a statement and he said he would make a statement and he did make a statement quoted above on page 704; that he told appellant that he would not have to make a statement and that any statement he made could be used against him in court. He also told appellant he had a right to an atorney and to consult with an attorney before making any statement and have such attorney present while he was making his statement. He stated appellant never did ask for an attorney. The pre-*Miranda* predicate was laid and the court determined that the signed statement of appellant was voluntary and it was admitted into evidence over appellant's objections that appellant had already testified that he made some mistakes in that statement and that it would be repetitious to offer the statement. The court overruled the objection and the statement was received into evidence.

Appellant filed a motion for a new trial and a hearing was held. At the conclusion of the hearing, the motion for a new trial was overruled and denied.

As we said in the beginning of this opinion, the state was forced to rely on circumstantial evidence to prove appellant's guilt.

■ Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the defendant is thereby rendered admissible. *Johnson v. State,* 247 Ala. 271, 24 So.2d 17; *Phillips v. State,* 248 Ala. 510, 28 So.2d 542; *DeSilvey v. State,* 245 Ala. 163, 16 So.2d 183; *McKee v. State,* 33 Ala.App. 171, 31 So.2d 656; *Harnage v. State,* 49 Ala.App. 563, 274 So.2d 333.

■ We recognize the rule that one should not be convicted on mere suspicion, or for fear he might have committed the act, The theory that he did so must be supported by legal evidence.

■ There are, however, a number of incriminating circumstances reasonably calculated to connect the appellant as the guilty agent in the death of Jeanne Marie Aiello. He was the last person known to have been near her at 9:00 P.M. on the night of her disappearance. He said he was working with his cousin on April 11th but his cousin testified that he was not. He told his cousin's wife that he bought the pistachio nuts at the store and he was seen by Mr. Hawthorne buying nuts at the Zippy-Mart at 9:00 P.M. on the night of April 11 as the deceased was walking across the street from the C-Mart toward the Zippy-Mart with a sack in her hand followed by her little dog. When he went in the Zippy-Mart, Mr. Hawthorne saw the tattoo of a nude woman on the inside of his left arm. It is not disputed that he had such a tattoo. He drove to the Zippy-Mart in a Chevrolet Impala and the muffler had a hole in it and made a loud noise. He was seen driving in the direction the deceased was walking and returned in a minute or two driving at a high rate of speed going toward north Gadsden, and he did not live in that direction. He was seen with long scratches on both arms early the next morning and he did not have any scratches on his arms

prior to April 11th. Two days later he purchased an Etowah County tag to replace a Tennessee tag on his Chevrolet and the very next day he traded the Chevrolet for a Chrysler automobile. On the night of April 11th he had reddish blonde hair, sideburns and a mustache. A few days later his hair was dyed a light brown shade and he had shaved off his mustache. He gave the officers a written statement, signed by him, as to his whereabouts on the night of April 11th and he admitted on the witness stand that he had given them a false statement. Then there is the matter of the knife he borrowed two weeks before the killing. This knife was never returned to his cousin though the scabbard that came with the knife was turned over to the authorities by his cousin and introduced in evidence.

Any one of the above circumstances, when viewed isolationally, would be insufficient upon which to hinge a conviction, but the totality of these incriminating circumstances, coupled with the testimony of his own mother, Willie Fern Wall and himself, which exploded his alibi, required the submission of the case to the jury. *Harnage v. State,* supra; *Clark v. State,* 54 Ala.App. 217, 307 So.2d 28.

■ Alibi evidence in a criminal prosecution is always a jury question. *Price v. State,* 53 Ala.App. 465, 301 So.2d 230.

In *Haggler v. State,* 49 Ala.App. 259, 270 So.2d 690, this court said:

"(But) where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Whether there is such evidence is a question of law, its weight and probative value is for the jury. *Bolton v. State,* 21 Ala.App. 373, 108 So. 631."

See *Howard v. State,* 108 Ala. 571, 18 So. 813, 815, wherein the court said:

" * * * It is enough to say there was not that want of criminating evidence,—

such want of evidence of every fact material to a conviction,—as required that the court should withdraw it from the consideration of the jury. The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant. * * *"

■ Appellant objected to the introduction in evidence of photographs of the nude body of the deceased showing numerous stab wounds on the ground they would tend to inflame the minds of the jury.

In *Harnage v. State,* supra, we said:

"Gruesomeness is not ground for excluding evidence consisting of photographs and clothing if it has a reasonable tendency to prove or disprove some material fact in issue, or which at the time appeared to be probably in dispute or material, and if it illuminates the issues in any way, and is relevant, it is admissible even though possessing a tendency to inflame the minds of the jury. *McKee v. State,* 33 Ala.App. 171, 31 So.2d 656; *Grissett v. State,* 241 Ala. 343, 2 So.2d 399; *Wilson v. State,* 31 Ala.App. 21, 11 So.2d 563."

See also *McKee v. State,* 253 Ala. 235, 44 So.2d 781, and *Butler v. State,* 54 Ala.App. 468, 309 So.2d 505.

■ In reviewing the refusal of a motion for a new trial, this court will indulge every presumption in favor of the correctness of the ruling of the trial judge and the decision thereon rests largely within the sound discretion of the trial court. *Clark v. State,* supra, and cases therein cited.

There was no error in overruling the motion for a new trial.

Appellant bitterly complains about the closing arguments of the prosecuting attorneys though he made no objections thereto. He gambled and speculated on the verdict of the jury and then raised the issue in his motion for a new trial.

The arguments of the prosecutors as well as the argument of appellant's counsel are reported in full in the record. It cannot be gainsaid that the prosecuting attorneys made strong appeals to the jury for a conviction. Appellant's counsel made just as strong an appeal to the jury for an acquittal of his client.

■ Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence. *Lindsey v. State,* 17 Ala.App. 670, 88 So. 189; *Cross v. State,* 68 Ala. 476; *Hobbs v. State,* 74 Ala. 39, 41.

We think what the Supreme Court said in *Arant v. State,* 232 Ala. 275, 167 So. 540, is a complete answer to appellant's bitter complaint concerning the arguments of the prosecuting attorneys. There the court said:

"Indeed, defendant insists that the matter of argument and method of examination of witnesses by the solicitor, in large part hereinabove related, was improper and reprehensible, and highly prejudicial to such an extent as to call for a new trial. Much stress is laid upon the case of *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. But we find no parallel between that case and this. We are in full accord with the holding that a prosecuting officer should be fair and take no undue advantage of the accused. But the argument here advanced would require more, and would leave out of consideration the solicitor's conviction that he was discharging a duty to society by his prosecution of the accused whom he honestly believed guilty, and it would leave out of consideration the human element that in the heat of debate some harsh expression, though justified by the proof, fell from his lips. The proprieties

must not be overreached. But, after all, we must not lose sight of the fact that a trial is a legal battle, a combat in a sense, and not a parlor social affair. The solicitor is yet under duty to prosecute with earnestness and vigor—to strike hard blows, but not foul ones. *Berger v. United States,* supra.

"So viewed, we find nothing in the conduct of the solicitor throughout the trial which could be said to be reprehensible in the least. The crime was most revolting. All parties concerned were people of more or less prominence in the community. The trial appears from this record to have been fairly conducted, and with due decorum."

We find no reversible error. Accordingly the judgment of conviction is affirmed.

Affirmed.

All the Judges concur.