Johnny Lee CRONNON,
Petitioner-Appellant,

v.

STATE OF ALABAMA,
Respondent-Appellee.

No. 77–3393.

United States Court of Appeals,
Fifth Circuit.

Jan. 8, 1979.

Myron K. Allenstein, Gadsden, Ala. (Court-appointed), for petitioner-appellant.

William J. Baxley, Atty. Gen., David W. Clark, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.

Before COLEMAN, CLARK and RUBIN, Circuit Judges.

COLEMAN, Circuit Judge.

This is a case in which a man convicted of the particularly revolting murder of a fifteen year old female was nailed by the tattoo of a nude woman on his left forearm.

Relying on the contents of the state court records, the District Court denied Johnny Lee Cronnon's petition for habeas corpus.

Cronnon was convicted of first degree murder in the Circuit Court of Etowah County, Alabama.[1] We have already rejected a claim that the evidence was insufficient to convict, *Cronnon v. Alabama*, 5 Cir. 1977, 557 F.2d 472.[2] We remanded, for

1. The conviction was affirmed, *Cronnon v. State*, 56 Ala.App. 192, 320 So.2d 697, *cert. denied*, 294 Ala. 756, 320 So.2d 709 (1975), *cert. denied*, 423 U.S. 1077, 96 S.Ct. 864, 47 L.Ed.2d 88 (1976).

2. On the night of April 11, 1974, Jeanne Marie Aiello, a fifteen-year-old girl residing at 104 Oakleigh Drive, Gadsden, Alabama, was stabbed to death about ten miles north of Gadsden. Her nude body was found early

consideration on the merits, claims which the District Court had declined to reach. On remand, that Court again denied habeas corpus relief. The case is here again. For the second time, we affirm.

## I.

Cronnon first contends that the state trial court denied him due process by permitting an in-court identification which was based, at least in part, upon an unduly suggestive pretrial photographic identification.

Although the facts are discussed in detail in the reported opinion of the Alabama Court of Appeals, 56 Ala.App. 192, 320 So.2d 697 (1975),[3] we briefly note the basic outline.

In Gadsden, Alabama, at about 8:55 p. m. on April 12, 1974, Jeanne Marie Aiello, a fifteen-year-old, left on foot for the C–Mart Grocery Store. Across the street from the C–Mart was the Zippy Mart. At the Zippy Mart, Donovan Hawthorne was sitting in his car while his wife was inside shopping. He saw the girl walk to, and return from the C–Mart.

Hawthorne also observed a blond haired male pull into the Zippy Mart parking lot shortly after the girl walked by on her way to the C–Mart. The male went inside the Zippy Mart, where he remained for about two minutes:

> walked in—went in the front—went down in front and went over to the book-stand and turned around and looked out the window, walked back across and down in front of the counter and around toward the back and turned around and come back around to the peanut stand and picked up a bag of peanuts and bought them and come out.

320 So.2d at 700.

Hawthorne then observed the individual head toward his car, which was parked near the dirt road running between the girl's home and the Zippy Mart. However when Hawthorne next looked, the man had disappeared but his car was still there. Shortly afterwards, Hawthorne observed Miss Aiello, returning from the C–Mart, walk down this particular dirt road. About one or two minutes later Hawthorne heard the car "crank up" and observed it going down that dirt road in the same direction Miss Aiello had taken. About a minute later the car turned around and drove off the dirt road onto the highway "at a pretty high rate of speed and almost run into us".

Early the next morning the girl's body was found, nude and mutilated. Hawthorne heard about it on the radio and that afternoon he gave a written statement to the police. He provided the police with a detailed description of the male he had observed. The man was described as a 20–24 year old white male who was about 5'8"– 5'9" tall and weighed about 160–170. He had "Blonde Hair with a black streak in his hair on the right side" and, further, he had a mustache. Hawthorne also pointed out that the man had a tattoo of a woman on his left forearm. Finally, the man had driven a "1966 Chev. White Impala" with a loud muffler.

In addition to providing a written statement, Hawthorne unsuccessfully attempted to identify the male suspect from a set of photographs which the police brought to his house.

About one or two months after the murder, police officers brought Hawthorne six

---

the next morning lying alongside Interstate 59. An autopsy was performed by Mr. Vann Pruitt, Assistant State Toxicologist in charge of the Huntsville Division. The autopsy revealed that she had been raped as spermatozoa was found in her vagina. There were fourteen (14) stab wounds mostly in the area of her breasts, and she had been struck on the head with a blunt-type instrument. According to Mr. Pruitt's opinion, the blow to her head was probably an hour prior to the stab wounds, reasoning, "in order for the

degree of swelling and hemorrhage to develop underneath the scalp with the heart beating as opposed to being postmortem."
320 So.2d 698.

3. Cronnon was 33 years old. He testified in his own behalf. He stated on cross examination that he had been convicted and sentenced to prison for a total of 24½ years for various felonies, state and federal, including armed robbery. He was out on parole.

mug shots. He identified Cronnon as the man he had seen, as above related.

At trial Hawthorne identified Cronnon as the individual he had observed at the Zippy Mart.

Cronnon contends that such in-court identification was inadmissible due to the suggestive police identification procedures followed prior to trial and, further, that the court below erred in failing to hold an evidentiary hearing at which such contentions could be proved.

■■■ The District Court properly resolved the identification claim without resorting to an evidentiary hearing. A federal habeas court is not required to hold such a hearing unless, at a minimum, the habeas corpus applicant *alleges* facts which, if proved, would entitle him to relief. *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *see also Bloodworth v. Hopper*, 5 Cir. 1976, 539 F.2d 1382, 1384; *United States v. Smith*, 5 Cir. 1977, 546 F.2d 1275, 1279, and cases cited therein.

Moreover, there was a detailed court record as to how the identification was accomplished.

The question, then, is whether the in-court identification followed a photographic identification procedure which was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and thus was constitutionally inadmissible. *See Manson v. Brathwaite*, 432 U.S. 98, 109–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

> [The] inquiry is whether the identification procedure was unnecessarily suggestive; if so, the court must then determine whether the procedure created a substantial risk of misidentification.

*Swicegood v. Alabama*, 5 Cir. 1978, 577 F.2d 1322, 1325.

*See also United States v. Smith, supra,* 546 F.2d at 1279, and cases cited therein.

Cronnon maintains that the photographic array in the second identification session was "unnecessarily suggestive" because the Cronnon photograph was the only one of the six photographs showing an individual with blond hair. Even if it be conceded that the pretrial identification procedure was unnecessarily suggestive, there are no facts in dispute which would tend to establish that the procedure created a substantial risk of misidentification. What we have here is an argument over the legal implications to be drawn from undisputed facts. An evidentiary hearing is not required under such circumstances. *Anderson v. Maggio,* 5 Cir. 1977, 555 F.2d 447, 452–53.

■■■ The District Court held that the admission of the in-court identification did not deprive Cronnon of due process. This was not error. Even if it is assumed that the pretrial identification procedure was "unnecessarily suggestive" it must nonetheless be remembered that "reliability is the linchpin in determining the admissibility of identification testimony". *Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253.

In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court suggested a number of factors to be considered in resolving the reliability inquiry:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382.

From the undisputed testimony in the trial transcript, it is evident that the in-court identification was sufficiently reliable. Hawthorne had a good opportunity to view Cronnon. Hawthorne testified that the Zippy Mart had lights in front and was "fairly well lit up". Hawthorne watched Cronnon inside the store, and there is no argument that it was not well lighted. Hawthorne paid a great deal of attention to Cronnon, as manifested by his detailed account of Cronnon's physical characteris-

tics and his activities in the area. It can be argued that he had no special reason for observing the then unknown male, but the fact remains that he did pay close attention to him.

Hawthorne provided an essentially accurate description of Cronnon. There was some discrepancy in his descriptions of Cronnon's appearance with respect to the hair style, length, and tint and as to Cronnon's weight. The evidence showed that a few days after the murder Cronnon's hair was dyed a different color by his stepmother. Moreover, any discrepancies must pale in comparison to the remainder of Hawthorne's description which is not claimed to be inaccurate. For example, Hawthorne noted that the man he observed had a tattoo of a nude woman on the inside of his left forearm. Indisputably, Cronnon had such a tattoo.

There is no dispute that the photograph picked out by Hawthorne was that of Cronnon.

The photographic identification was made two months after the murder and ordinarily "[T]his would be a seriously negative factor." However, Hawthorne made no identification at the first photographic session and thus demonstrated a "record for reliability". *Neil v. Biggers, supra* at 201, 93 S.Ct. at 383.

Moreover, Hawthorne testified that he saw Cronnon pick up a bag of "peanuts" while he was in the Zippy Mart. The wife of defendant's first cousin testified that Cronnon had been staying in their home for two or three weeks. When he got home "around 10 p. m." on the night of the murder, he had a bag of pistachio nuts, which he said he had gotten "at the store".

## II. *Withheld Evidence*

On motion for new trial Cronnon argued that the government withheld molds of tire and foot prints, which were assumed to be exculpatory, and thus deprived Cronnon of a fair trial, as guaranteed by the Due Process Clause of the Fourteenth Amendment, under the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). It is now undisputed that such evidence never existed, so this point need not detain us any further.

■ Cronnon also complains because the government failed to produce the testimony of Sam Dutton. Dutton did not testify at Cronnon's trial. What he did do was to testify at a hearing, held subsequent to Cronnon's trial, to determine whether Dutton was entitled to a reward for having provided information which led to Cronnon's conviction. This would hardly be exculpatory, and, in any event, Dutton's testimony was not used to secure the conviction.

## III.

Deprivation of a fair trial is also claimed as a result of the admission of photographs of the victim into evidence.

■ We have repeatedly admonished that "we do not sit as a 'super' state supreme court" in a habeas corpus proceeding to review errors under state law. *Martin v. Wainwright,* 5 Cir. 1970, 428 F.2d 356, 357, *cited in Houston v. Estelle,* 5 Cir. 1978, 569 F.2d 372, 380. The "mere violation of evidentiary rules by the state trial court does not in itself invoke habeas corpus relief, but only where the violation of the state's evidentiary rules results in a denial of fundamental fairness should habeas be granted. *Woods v. Estelle,* 547 F.2d 269 (5th Cir. 1977)." *Anderson v. Maggio, supra,* 555 F.2d at 451; *accord Corpus v. Estelle,* 5 Cir. 1978, 571 F.2d 1378, 1381. Thus we have held that "the erroneous admission of prejudicial evidence can justify habeas corpus relief only if it is 'material in the sense of a crucial, critical, highly significant factor.' " *Anderson v. Maggio, supra,* and cases cited therein.

■ We seriously doubt that the admission of either the photographs or that of the nonsequestered witness's testimony, (also challenged), constituted a violation of state law, which generally affords the trial judge a great deal of discretion in this area. *See*

*Brown v. State,* 288 Ala. 684, 264 So.2d 553, 554 (1972) (photograph); *Jarvis v. State,* 138 Ala. 17, 34 So. 1025, 1032 (1903) (witness sequestration); *Stone v. State,* 55 Ala.App. 663, 318 So.2d 359, 364 (1975) (witness sequestration). In any event we are unable to conclude that error, if any, committed by the state trial court was of a constitutional dimension. Thus the admission of the photograph and the testimony into evidence does not justify habeas corpus. *See Anderson v. Maggio, supra; Martin v. Wainwright, supra,* 428 F.2d at 357.

■ Similarly, improper jury argument by the prosecution will not justify habeas corpus relief unless it is "so prejudicial that they render the trial fundamentally unfair." *Houston v. Estelle, supra,* 569 F.2d at 378 n. 8 and cases cited therein.

■ The prosecutor's alleged misconduct must be viewed in the context of the entire trial. *United States v. Socony-Vacuum Oil Co., Inc.,* 310 U.S. 150, 239, 242, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Houston v. Estelle, supra,* 569 F.2d at 383. Ordinarily great latitude is given the prosecutor in closing argument. *Id.* "[A] defect of constitutional proportions is not to be found in any but egregious cases." *Id.* at 382.

■ Cronnon particularly objects to the prosecutor's argument,

asking what kind of "fiendish ghoul" could have committed such a crime, waving the gruesome pictures before the jury, and referring to the "stark terror on the little girl's face" and the assailant's desire to hear the "squish of her blood". *Cronnon v. Alabama,* 5 Cir.1977, 557 F.2d 472.

This is strong language, uttered with reference to a fiendish crime. It was completely in accord with the evidence in the case. The toxicologist who conducted the autopsy testified that the deceased had been stabbed fourteen times, as well as struck on the head with a blunt instrument. The stabbing had penetrated the pulmonary artery of the heart and also the right auricle of the heart. These wounds, "resulting in extensive hemorrhage", were the primary cause of death. It would be an insult to all known physical facts to suggest that the blood did not "squish". We decline the invitation to hold as a matter of law that this comment by the prosecutor violated the defendant's constitutional rights.

### IV. *State Appellate Court*

■ We reject Cronnon's argument that he was denied due process when the state appellate court "refused to adjudicate" his claims as to identification, withheld evidence, and the sequestered witness. After reviewing the decision of the Court of Criminal Appeals of Alabama, 56 Ala.App. 192, 320 So.2d 697 (1975), and the briefs filed before that tribunal, we find this contention to be without basis in fact.

### V. *Conclusion*

The Judgment of the District Court is AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, concurring in the result:

Although I concur in the result, and I respect fully the sincerity of my brethren and the experience on which they base their view of the prosecutor's conduct, I think that we should not condone it. In addition to the remarks referred to in the majority opinion, which I do not consider either warranted or proper, the prosecutor in closing argument made several other intemperate remarks.

First, he suggested that, if set free, Cronnon would kill again: "Well, you turn him loose and whose little girl will be next? Who will be next?" Several times during the argument, the prosecutor commented vehemently on Cronnon's testimony, for example: "I don't blame him because if I had committed such an atrocious, ugly, brutal, murderous thing as that, I would lie about it from here on, as anybody would if they had done so." Finally, in referring to the pictures taken of the victim's body, the prosecutor asked the jurors to imagine how

the parents of the victim feel: " . . . if we can ever put ourselves in the shoes of the loved ones of those victims, justice will shine through, then truth comes through, after all, what we are seeking is truth and justice. I'm sure you will all look at these pictures of how this child was found down by the side of I–59 on the road."

Neither the fact that the crime was vile nor the amount of evidence against the defendant justifies vituperative argument by the prosecutor. Indeed the greater the weight of the evidence and the more reprehensible the crime, the less necessity or justification is there for the prosecutor to inflame the jury.

In *Houston v. Estelle*, 5 Cir. 1978, 569 F.2d 372, we found that a state prosecutor's conduct so exceeded the bounds of fundamental fairness as to deny the defendant due process. Earlier, in *Alvarez v. Estelle*, 5 Cir. 1976, 531 F.2d 1319, *cert. denied*, 1977, 429 U.S. 1044, 97 S.Ct. 748, 50 L.Ed.2d 757, we declined to find a constitutional violation in the state prosecutor's argument because it included only a single improper remark in an otherwise fair trial.

The prosecutor's conduct here falls somewhere between these two bounds. He did not go so far afield as the prosecutor in *Houston*. Moreover, no objection was made to the closing argument and the issue of its impropriety was raised only in a motion for a new trial. Thus the trial judge was never asked to assert his authority to warn the prosecutor to temper his remarks and abate his zeal, or to instruct the jury to disregard him. Finally, it is likely that the spleen was unnecessarily spent; the proof against the defendant was overwhelming.

For these reasons, I join in the affirmance of a result obtained by means that I disapprove.