HARRIS, Judge.
Appellant was convicted of the offense of bribery to commit a felony and he was sentenced to five years imprisonment in the penitentiary. Prior to arraignment appellant was found to be indigent and the Court appointed counsel to represent him at arraignment and trial. He interposed a plea of not guilty. After conviction he gave notice of appeal and was furnished a free transcript. New counsel represents appellant on this appeal.
Omitting the formal parts the indictment reads as follows:
“Christopher A. Burns did corruptly give, offer, or promise one Willie L. Peterman a certain gift, gratuity, or thing of value, to-wit: two hundred fifty dollars, with intent to induce or influence the said Willie L. Peterman to commit a certain crime or offense punishable as a felony, to-wit: the offense of murder by unlawfully and with malice aforethought killing Patricia W. Burns, against the peace and dignity of the State of Alabama.”
This is one of the most baffling and perplexing cases to reach this Court in a long time. It is the State’s theory that appellant let a “contract” on the life of his ex-wife so that he could gain full custody of his eighteen-month old son. The genesis of this case began with an unfortunate marriage between appellant and his intended victim on whom he allegedly let a “contract” to kill her for five hundred dollars. It has been most difficult to piece together the tangled web of circumstances revealed by the record in this case which eventually led to the arrest and conviction of appellant. This is due largely to the fact that this case is so unreal and shocking that it staggers the rational thinking of legal or even lay minds that any man would hire a “hit” man to kill the mother of his child. He had nothing to gain except the possible custody of his young son. We say possible custody for the simple reason that if his ex-wife had *485 been murdered, and his involvement had come to light, no court in the land would have awarded the care, custody and control of the young boy born of this union to appellant.
The marriage of the parties here involved was doomed from the beginning. It was a stormy marriage beset with arguments, quarrels and violence. There were charges and counter charges, recriminations heaped upon recriminations, and hovering above and over this union were dark clouds of tempestuous winds of unabated force which propelled them straight to a divorce court. They entered into a separation agreement in which the wife and mother was awarded sole custody of the child with rights of visitation given to appellant at reasonable times when agreed to by the mother. In addition to settling their property rights, debts and obligations, it was agreed that appellant would pay the sum of $50.00 on the first and fifteenth of each and every month until the child reached his majority. The final decree of divorce was signed on February 7, 1975, and the separation agreement was merged into and became a part of the divorce decree as if fully set out therein. According to the mother appellant was considerably in arrears in support payments at the time she learned that her life was in danger.
Mrs. Burns testified that during her marriage to appellant she had given him a wallet-sized photograph of herself which was made at the time she graduated from high school. She stated that he carried this photograph in his wallet but he had access to all of her photographs. This wallet-size photograph was to play a prominent and major role in the plot on her life. Reference to this photograph will be made later in this opinion.
Mrs. Burns further testified that during her marriage to appellant they had a great deal of difficulty. She stated appellant had often threatened her and had inflicted physical violence on her. That on one occasion he struck her and a friend had to call the police. She stated that on another occasion they had a heated argument when she was four and a half months pregnant and he told her he was going to see that she didn’t get any rest or sleep that night. That she laid on the couch for a while and then got in bed. Appellant came into the bedroom and pulled the mattress off the bed and threw her on the floor.
Mrs. Burns further testified that after their marriage they lived in Phenix City for a few months and then moved to Montgomery where appellant went to work for a local funeral home. He worked there for about six months and then got a job with the State for another six months. They got the divorce while they were living in Montgomery. After the divorce she moved to Columbus, Georgia, and got a position with the Barrington Ford Company. She lived with her son at 1033 Quincey Drive in Columbus which was on the East end of town off Buena Vista Road. That Barrington Ford had two locations in Columbus and she worked at the one located on Box Road which was off the Lindsey Creek Bypass and Macon Road. That in January, 1976, she owned a white 1975 Ford Mustang automobile.
Mrs. Burns stated that in early January of 1976 she received a telephone call from a man who asked her if she was the same Pat Burns that he went to school with at Central High School and she told him no, that she graduated from Kendrick High School in 1970. She said the man identified himself to her but she could only recall the name “Willie” and she could not remember the man’s last name. She later learned his full name when she got a call from two detectives from the Phenix City Police Department who told her they wanted to come to the place where she was working to discuss a matter with her relative to her safety. She agreed to see them and the next day Captain Clark and Lieutenant Banks came to the place where she was employed and informed her that her life was in danger. She identified an eight-by-eleven photograph of her which was taken where she graduated from high school and also a wallet size of the same photograph which was like the same photograph she *486 had seen in her husband’s wallet. Both of the photographs were admitted into evidence without objections.
Willie L. Peterman was called by the State as a witness and testified that he first met appellant through a mutual friend named John Golden in August of 1975; that John Golden was a friend of his and he had known him for about eight years. He further stated that he promised John Golden that he would help him move his furniture from the mini-storage place to a trailer home and that they met at Lakeview Funeral Home where he was introduced to appellant. He stated that they rode out to the mini-storage place in a van used by the funeral home to transport flowers in connection with funerals. The mini-storage place was locked and John Golden drove to some place to use the telephone to see if he could get a key to the storage place but was unable to do so.
He stated that while John Golden was out of the vehicle appellant said to him that he had somebody that he wanted killed. Peterman thought he was joking and said he would do it for $150, that nothing else was said at that time by appellant as to whom he wanted killed. The next time he saw appellant was just before Christmas at the Safari Club between Phenix City and Opelika when he stopped by to pay a bar bill. He said that John Golden was working at the bar of this club and told him he did not have time to look for his bar bill, whereupon Peterman asked appellant to see if he could find it. Appellant looked in the cash register and said he could not find it and Peterman left the Safari Club, stating he was there only about fifteen minutes.
Peterman further testified that the next time he heard from appellant was while he was working at the Five Points Texaco Service Station in Phenix City when he received a telephone call from appellant; that appellant said, “Bill, this is Chris,” and Peterman then recognized appellant’s voice and appellant said, “The price has gone up to $500.” Peterman told appellant to come to the station and talk to him about it; that he came to the station and Peterman told him that he wanted the $500 at one time. Appellant said he would not pay him $500 at one time, that he would pay him $250 and then when the job was done, he would pay him the other $250. In this same conversation appellant told Peterman the reason he would not pay him the $500 at one time was that he had paid it one time before and had gotten ripped off. According the Peterman appellant said he wanted his wife killed because he wanted to get the baby and Peterman said, “The court probably won’t rule on the baby if she was to get killed and there wasn’t no sense in killing her,” to which appellant replied, “Just go ahead and do it, that it wasn’t any of my business why he wanted it done.” According to the testimony of Peterman they talked further about the matter and appellant said he would be at the station the next morning with $250, that appellant came to the service station the next morning with $250 and it was all twenty-dollar bills except one ten-dollar bill, and that he also had a five-by-seven card with the description of his ex-wife and where she lived and what kind of car she drove and that she lived with her child who was a year and a half old at the time. There was a further description of his ex-wife showing what she weighed and how tall she was, being 5'7" and weighing 135 pounds and she had bleached-out blond hair; also that she was driving a 1975 Mustang automobile and on the card was the address showing that she lived at 1033 Quincey Drive which was off Buena Vista Road in Columbus, Georgia, and that she worked at Barrington Ford Motor Company. He stated that at this time appellant gave him a wallet-sized photograph of his ex-wife.
Peterman further stated that there was no one present when appellant gave him the five-by-seven card with all the information above described on it and a photograph of his ex-wife: that they were sitting in a vehicle that appellant drove to the service station in and that he was there only about fifteen minutes.
Peterman took the envelope containing the money, the card giving the description *487 of appellant’s ex-wife and other information and photograph and walked back into the service station where he showed them to the man who was working with him, Harley Waddell, and he told Waddell what appellant had employed him to do.
According to the testimony of Peterman he considered the whole thing a joke and never intended to kill Mrs. Burns or anyone else. He stated that he spent the money on bar bills and playing pool and other things. He further stated that he ran into appellant again at the Jocopa Club and he told appellant that he could not do what he wanted done and he tried to reason with him, but he could not reason with appellant; that on this occasion appellant told him, “I am still going to try to get it done, one way or the other.” He said that later on he received a telephone call from appellant in which he told him again that he could not do it and in this conversation appellant threatened him and asked him if her life meant more to him than his own life and that Peterman said, “What are you going to do? Put somebody on me like you put on her?” The appellant replied, “yes.”
He stated that he called up the Barring-ton Ford Company and asked to speak to Mrs. Burns and when she was connected to the call, he asked her if she was the same Patricia Burns he had gone to Central High School with and she told him no. He said after he found out she was still alive he tore up the card containing the information as to where Mrs. Burns lived, how to get to her home on Quincey and the other information contained on the card. He also tore up the wallet-size photograph that appellant had given him and put the fragments in a Dempsey Dumpster behind the service station. After doing this he called Officer Kenneth Alsobrooks of the Phenix City Police Department who came to the store where he made the call and he told the officer everything that had transpired up to that moment.
The next day Captain Clark and Lieutenant Banks came to the service station and told him that they were following up on the report that Officer Alsobrooks had filed with the Police Department and they asked him if he could find the card and photograph allegedly turned over to him by appellant. He said he went to the trash bin and found fragments of the photograph and the card and turned them over to the officers. He did not at that time find all of the pieces of the photograph and the card, and the officers got a call to go on another investigation. He stated he then dug further into the trash bin and found most of the other fragments of the photograph and the card that appellant had turned over to him at the same time appellant had given him the $250 in cash which was in a white envelope.
A warrant was issued for appellant and also for Peterman on a charge of conspiracy to commit murder and Peterman stated that after he got out of jail he went to see a lawyer in Phenix City and turned over to the lawyer the other fragments of the map and photograph that he had found in the trash bin and that this lawyer went to one of the Assistant District Attorneys where a deal was made in exchange for Peterman’s testimony. Peterman stated that his lawyer gave back to him the other fragments of the map and photograph and he turned them over to a detective who was working with the District Attorney’s Office. He stated that the case against him was dismissed.
Mr. Lamar Miller, a Criminologist with the State Department of Toxicology, testified that the fragments of the map and the photograph which Peterman had recovered from the trash bin were turned over to him for examination. He compared the photograph with another photograph that Mrs. Burns turned over to the District Attorney’s Office. The Criminologist was positive in his testimony that the fragments of the photograph that were found by Peter-man were a duplicate of the photograph of Mrs. Burns which was taken at her graduation from high school. The reconstructed portion of the photograph was introduced into evidence without objection.
Mr. Harley Waddell testified that he worked with Willie Peterman at the service *488 station and that he recalled during the month of January, 1976, that appellant came to the service station and pulled to the side and parked; that Peterman went to appellant’s car and ten or fifteen minutes later he came back into the service station with an envelope containing money, a map, and a girl’s photograph. His testimony was in conflict with that of Peterman’s as to the denominations of the money. He described the money as containing fives, tens, and twenties, whereas Peterman said all the denominations were twenties except for one ten-dollar bill.
The defendant offered witnesses who testified to his good character and reputation in the community in which he lived prior to the fifth or sixth of January, 1976, when he was charged with the crime of bribery to commit a felony. Each of them said that his character and reputation were good.
Appellant testified in his own behalf and denied ever asking Peterman to kill his ex-wife or anyone else. He did admit that he delivered some money to Peterman at the service station but that it was only $150 and this was a loan that Peterman had asked him to let him have for a few days. He further denied delivering to Peterman any map or photograph or any other information concerning his ex-wife.
John Golden testified in behalf of appellant and contradicted the testimony of Pe-terman in every respect. He stated that Peterman and appellant helped him move his furniture from the mini-storage to the trailer home he was going to live in and that Peterman and appellant were never alone together for any length of time or even out of his sight. He further testified that Mrs. Burns loaned them a layette and in the layette were several photographs of Mrs. Burns taken at the time she graduated from high school but after Peterman helped him move his furniture these photographs were missing and he did not see them again.
The testimony in this case was conflicting in the extreme. It is not within the province of this Court to pass judgment on the truthfulness or falsity of conflicting testimony and a verdict rendered thereon will not be disturbed on appeal. Snipes v. State, 50 Ala.App. 139, 277 So.2d 413; Pugh v. State, 51 Ala.App. 164, 283 So.2d 616; Waters v. State, 55 Ala.App. 646, 318 So.2d 342.
Appellant contends that this case should be reversed because of the action of the trial court in denying a mistrial because of the conduct of the District Attorney in cross-examining appellant as to previous convictions of offenses committed while he was a Youthful Offender in a Federal Court. There were no objections to two of the questions posed to appellant but appellant answered' them in the negative anyway. The District Attorney then asked appellant if he knew a probation officer in Columbus, Georgia, and he responded affirmatively. Appellant insists that none of the offenses inquired about involved moral turpitude.
The law is clear that a negative answer to an improper question does not constitute reversible error. Hurst v. State, 54 Ala.App. 254, 307 So.2d 62; Stephens v. State, 250 Ala. 123, 33 So.2d 245.
The District Attorney then asked appellant if he had pleaded guilty to the illegal possession of a federal check and if he had just completed a two-year probation period. This question was not answered but appellant’s counsel claimed that this matter involved Youthful Offender treatment and moved for a mistrial. At this point the jury was excused and in the absence of the jury, appellant’s counsel told the Court that these matters involved Youthful Offender treatment in the federal court and appellant and his mother would verify this as correct. At this point the District Attorney apologized to the Court and requested the Court to poll the jury to ascertain if they could erase these matters from their minds.
Thereupon the trial judge asked the jurors, separately and severally, if they could remove from their minds anything about a conviction, parole or anything else and give the defendant a fair and impartial trial. *489 Each juror responded in the affirmative. We think the action of the trial court was proper and effectively cured any possible error committed by the District Attorney in posing such questions. Mott v. State, 40 Ala.App. 144, 109 So.2d 309; Dufresne v. State, 40 Ala.App. 476, 116 So.2d 385; Coe v. State, 53 Ala.App. 457, 301 So.2d 223; Gavin v. State, 52 Ala.App. 469, 294 So.2d 169; Pelham v. State, 23 Ala.App. 359, 125 So. 688.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.