HARRIS, Presiding Judge.
Appellant was convicted of the crime of rape and the jury fixed his punishment at fifteen years imprisonment in the penitentiary. At all stages of the trial proceedings he was represented by counsel who represents him on this appeal. At arraignment he pleaded not guilty. After sentence was imposed he gave notice of appeal and bond was set at $15,000.00.
The evidence is in sharp dispute. The evidence presented by the State made out a clear-cut case of rape, natural and unnatural, and sodomy also. The victim was a twenty-three year old single white girl. Appellant is a black man. Appellant’s defense was an alibi.
The victim testified that her home was in Tampa, Florida, and that she was a student at the University of South Florida; that on *760 January 26, 1977 she was working at Marshall Space Flight Center in Huntsville, Alabama as a “co-operative education student” under an arrangement between the University of South Florida and NASA. While working at NASA she became friendly with a co-worker named Shirley Moore and it was arranged for the victim to visit the home of Shirley Moore on the night of January 26, 1977. The Moores lived in an apartment complex about two miles from the victim’s apartment. The victim drove her car to the Moore’s apartment, arriving at about 6:45 and staying until about 8:00 p. m. There were lights over the doors of the apartment complex and some street lights in the area. While walking down the stairs of the Moore apartment to go to her car she noticed a black man standing next to the building and about two or three feet from the bottom steps of the stairway. The victim was wearing blue jeans, a maroon sweater and an overcoat.
As the victim was almost to the bottom steps this black man pointed a silver colored pistol at her head and told her to come over to him and, if she didn’t, he would shoot her. She described this man as being shorter than she. She'further stated, “He had on a gold V-necked sweater and there was a white T-shirt underneath it, and on his head he had a golfing hat, something that went down almost to his eyebrows. He had on dark trousers. He had some whiskers on his upper lip and on his chin.” At this point she made a positive in-court identification of appellant as the man who pointed the silver colored pistol at her head and threatened to kill her if she refused to come to the place where he was standing. She further testified that when she walked over to him he grabbed her right arm in a firm grip and carried her behind the apartment buildings, pushed her head down and told her to give him her money. She opened her wallet and gave him all the currency she had which was seven dollars, including a Canadian dollar bill. She testified she saw this man face to face under the lights from the doors of the apartment for at least two to three minutes. The victim was asked to state what occurred afterwards.
From the record:
“Well, he asked me if that was all that I had. It was. Then he took me by the arm and he started walking out further behind the building. He told me to keep my head down. He took my glasses off of my face and threw them down. He took me back to a ditch and he put me down on the ground. Then he unloosened my pants and slipped them down over one leg and my underwear.”
She then went on to describe what he did to her while she was pinned down. He penetrated her private parts with his private part and then told her to have oral sex on him. She protested and he told her if she didn’t perform oral sex on him, he would blow her head off. She gagged through this experience and then he committed sodomy on her. He put his cap over her face while he had sexual intercourse with her and when he was finished he took his cap from her face and covered her head with her sweater. He then whistled twice and a car drove up beside the ditch with loud mufflers. This man who robbed and raped her took her pocketbook and told her to stay in the ditch until he was gone. She heard the car door slam and the car drive off. When she could no longer hear the car with the loud mufflers she put her clothes back on and walked to the apartment in which her friend Shirley Moore lived. She knocked on the door and Mr. Moore let her back in the apartment and she immediately told them she had just been robbed and raped. Mr. Moore called the Huntsville Police Department. The victim gave the officers a description of her assailant and showed them the ditch in which she was raped. In the ditch and the immediate area the officers found a pink comb, the victim’s glasses and a purchase slip from Sears bearing her signature. She stated the slip from Sears had been in her pocketbook prior to the robbery and rape. She said the pink comb did not belong to her. The officers also found a business card from a local motor company and the victim testified that she had never seen this card prior to the trial.
*761 The next day after this offense was committed a Detective displayed some fifteen to twenty photographs to the victim and requested that she look through them to see if she recognized anyone and she told the Detective that her assailant was not in the group but she indicated that one of the photographs resembled her attacker and requested that she be allowed to view this man in person. This man was brought in and upon viewing him she said he was not the man. A few days later she was called to Police Headquarters where she was presented six different photographs, without any knowledge that the suspect was in custody, at which time she identified the defendant. About fifteen or twenty minutes later she viewed a lineup of five black men and identified the No. 3 man in the lineup as the man who robbed and raped her on January 26, 1977. As she got ready to leave the station house she requested that she be allowed to view the lineup again to be absolutely sure she had identified the right man. Her second view of the lineup confirmed her identification of the No. 3 man as her assailant.
After her first interview with the officers she was carried to the emergency room of a local hospital where she had a pelvic examination by Dr. Alfred Owen, a specialist in gynecology and obstetrics with thirty years experience. The doctor conducted an examination of the victim and found at the vaginal opening mucous and congestion. He stated, “the congestion would indicate recent intercourse.” The doctor further stated that “the specimens were retained for further examination by the laboratory personnel” at the hospital who worked under his direction and control. Over appellant’s objection the doctor stated that the cervical smear, which he personally hand-carried to the laboratory with the slip carrying the patient’s name, was examined the next day and revealed “many sperm are present, acid phosphatase positive.” He further said, “The findings would be completely compatible with her having had sexual intercourse.” He stated that “congestion means that the area was red and swollen, as a sore throat would look, only this was at the lips of the vaginal opening. The findings were exactly as one would expect to find if a person had sexual relations prior to the examination.”
The investigating officers described in detail the physical condition of the victim when they first interviewed her. According to their testimony she appeared to be in shock and she was crying. Her clothes were wet and muddy as it had been raining that day and there was water in the ditch where the alleged rape occurred.
Police Officer Edward Nixon of the Huntsville Police Department testified that he was patrolling in the early morning hours of February 1, 1977, and had occasion to stop an automobile driven by one Thomas Lightfoot. When he stopped the car he found that appellant was a passenger in this car and he found a weapon on the front seat between the driver and appellant. It was a silver colored .38 Smith and Wesson pistol and was fully loaded. A search of appellant disclosed that he had an unspent cartridge in his pocket that was a .38 caliber cartridge, the same brand as those in the fully loaded pistol.
Officer Nixon further stated that the car he stopped was a 1972 or 1973 Chevrolet Impala, white, two-door hard-top with a white vinyl roof and the muffler was loud. In his words, “The muffler wasn’t a stock muffler.” The officer took possession of this pistol and carved his initials on the butt of the gun and made a notation of the serial number. This pistol was described by the victim as the silver colored pistol used by her assailant during the robbery and rape. It was admitted into evidence over the appellant’s objection.
Over appellant’s objections the sales receipt which was signed by the victim and was in her purse prior to the robbery was admitted into evidence. Also admitted jnto evidence was a photograph of appellant which was identified by the victim as the man who robbed and raped her. The photograph of the five black males in the lineup was also introduced into evidence.
*762 The names, ages, weight and height of the men in the lineup were introduced into evidence to show there were no marked disparities that would make any one of them stand out in comparison with the others that might tend to lead to a misidentifi-cation. They are as follows:
No. 1 — Howard Pruitt, height 5'5", age 28, weight 130 pounds
No. 2 — Johnny Eason, height 5'8", age 36, weight 168 pounds
' No. 3 — Carl Hammonds, height 5'4", age 26, weight 150 pounds
No. 4 — Thomas Lightfoot, height 5'9", age 25, weight 140 pounds
No. 5 — Roy Conley, height 5'6", age 29, weight 140 pounds.
At the close of the State’s case appellant made a motion to exclude the evidence on the ground the State failed to prove a pri-ma facie case. This motion was overruled.
The defense called Thomas Lightfoot, the driver of the car, with the loud muffler, in which appellant was a passenger and where the silver colored pistol was found on the front seat between Lightfoot and appellant. Lightfoot’s attorney was in court when Lightfoot took the witness stand and he made known to the Court that Lightfoot, on his advice, was not going to testify on the ground that his testimony might tend to incriminate him.
From the record:
“I am Henry Mims. I am the attorney for Thomas Lightfoot. We intend to invoke the Fifth Amendment to every question beyond his name and residence. I do not wish to waste the Court’s judicial time, but my client is facing a serious charge himself. He will not testify to what occurred that night, or any other night. He will invoke the Fifth Amendment on all questions beyond his name. We respectfully ask the Court not to do this in front of the jury. He will not testify, sir.”
Counsel for the defense stated they had subpoenaed him and wanted to put him on the witness stand. The Court ruled that Lightfoot would have to take the witness stand and his attorney could exercise his objections. This took place outside the presence and hearing of the jury. Light-foot stated his name and said his residence was the County jail. From that time forward to every question posed to him, he replied: “Fifth Amendment.”
Appellant did not testify but offered the testimony of four witnesses in support of his alibi. In sum, their testimony was that on the night of January 26, 1977, appellant was in their company while they viewed the television movie “Roots,” and that he spent the night at the home where the movie was shown.
According to the testimony of the victim, appellant’s privates were very large. Appellant called several witnesses who testified they had seen him nude and that his privates were small. Counsel for appellant moved the Court to permit the appellant to display his privates to the jury so that they could judge for themselves the size of his privates. The Court refused this motion.
Appellant claims the trial court committed reversible error in permitting the jury to separate and go to their homes following the second day of the trial. The record does not support this contention.
From the record:
“The Court: My next question is this: Is it okay with you to allow the jury to separate tonight and go their separate ways to their homes with the instructions that they would not talk to anybody about the case or have anyone talk to them about it?
“Defendant: Okay, I will allow them to go home.
“The Court: Is that okay with you, now, to allow them to be separated, whatever twelve is selected?
“Defendant: Yes.”
Section 12-16-9, Code of Alabama 1975, governs the separation of the jury in crimh nal cases, and provides:
“If the accused and his counsel and also the prosecuting attorney, in any prosecution for felony, whether capital or non-capital, consent thereto in open court, the *763 trial court in its discretion may permit the jury, trying the case to separate during the pendency of the trial, whether the jury has retired or not. A separation so permitted shall not create a presumption of prejudice to that accused, but on the contrary it shall be prima facie presumed that the accused was not prejudiced by reason of the separation of the jury.”
The record shows a clear consent of appellant for the jury to separate during the pendency of the trial and this means the entire trial. The Court was under no duty to take any further action in allowing the jury to separate on the second day of the trial absent an objection and a ruling thereon. There was no objection to permitting the jury to separate on the second day of the trial. In Turner v. State, 54 Ala.App. 467, 309 So.2d 503, we held this matter could not be raised for the first time on appeal.
There was no error in refusing to permit the appellant to display his genital areas to the jury. Several witnesses testified that they had observed appellant nude and that his private parts were small. No doubt they appeared extremely large when the victim was raped, forced to have oral sex with appellant and when he committed an act of sodomy on her.
It is not within the province of this Court to pass judgment on the truthfulness or falsity of conflicting evidence and a verdict rendered thereon will not be disturbed on appeal. Burns v. State, Ala.Cr.App., 346 So.2d 484.
Alibi evidence is always a jury question. Ala.Dig.Crim.Law, ©=>739(2).
The pistol found on the front seat of the automobile in which appellant was riding when arrested and which fit the description given the officers by the victim was properly admitted into evidence. Ala. Dig.Crim.Law, ©==>404(3) and 404(4).
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.