372 So.2d 1331 (1979)
Eddie Barnard NEAL
v.
STATE.
6 Div. 894.
Court of Criminal Appeals of Alabama.
May 1, 1979.
On Rehearing May 11, 1979.
*1333 J. Wilson Dinsmore and Larry Waites, Birmingham, for appellant.
Charles A. Graddick, Atty. Gen., and Thomas R. Allison, Asst. Atty. Gen., for the State, appellee.
*1332 HARRIS, Presiding Judge.
Appellant was tried and convicted pursuant to provisions of § 13-11-2(a)(2) Code of Alabama 1975, which provides for the imposition of the death penalty or life imprisonment without parole when the defendant is found guilty of robbery or attempts thereof when the victim is intentionally killed by the defendant. Throughout the trial proceedings he was represented by court-appointed counsel who represents him on this appeal. At arraignment, in the presence of counsel, he pleaded not guilty.
*1334 Upon a hearing to determine the aggravating and mitigating factors and circumstances, the trial court refused to accept the death penalty verdict and sentenced the defendant to life imprisonment without parole.
The victim was Miss Quenette Shehane of Clio, Alabama, who had just recently graduated from Birmingham Southern College, and was working at Parisian's Department Store located at Five Points West. She was last seen alive by her fiance, Ramsey Howard Lane, at the ATO Fraternity house on the campus of the Birmingham Southern College on December 20, 1976, at 6:20 p. m. Ramsey was cooking food on a gas grill at the back of the fraternity house while waiting for Miss Shehane to get off work. When she arrived at the fraternity house she decided to drive to a nearby grocery store for a bottle of salad dressing for the salad they were to eat that night. She was driving a white four-door Mercury Marquis, and her car was packed with her possessions, including some wrapped presents, as she was going home for the Christmas holidays. Ramsey walked Miss Shehane to her car and watched her drive down 12th Street towards the entrance to Fraternity Road.
Ramsey further testified that on December 20, 1976, Miss Shehane owned a portable television set and he saw it packed in her car, the day before she disappeared, along with her other possessions which she had removed from her room. He stated that he was with her when she purchased the television in September, 1976, from Sears in the Century Plaza and that it was a birthday present. He had seen the television set almost daily since it was purchased. He identified State's Exhibit 12 as the television set belonging to the victim.
He testified that when he last saw her on December 20, 1976, "She wore a blue jean type skirt and a white turtleneck type blouse; she had on someI believe a white bracelet and some beaded wooden-type earrings and a rust colored car coat." Ramsey waited at the fraternity house for about forty-five minutes and when she did not return he became very apprehensive and started driving around in the neighborhood, thinking, perhaps, her car had broken down. He drove to the nearest convenience store located on Graymont Avenue, then to a store on College Hill and finally to Five Points West to a larger grocery store. His search proved fruitless and he returned to the fraternity house and made inquiries of several people in his efforts to locate her but no one had seen her. He then called the emergency room of a local hospital but he was unable to determine her whereabouts.
During the trial Mr. Ramsey identified State's Exhibit 12 as the television set owned by the victim and which was packed in her car the day before she disappeared. He identified State's Exhibit 13 as the skirt she was wearing when she left the fraternity house to get a bottle of salad dressing, and State's Exhibit 14 as a coat belonging to the victim which was in her car at that time.
Mr. Curtis Eiland testified that he was a teacher at Clio High School and that Quenette Shehane was his niece. He last saw her alive during the Thanksgiving holidays of 1976 at the home of her grandparents in Clio. The next time he saw her was Tuesday, December 21, 1976, at the Cooper Green Hospital and she was dead.
Mr. Jack R. Parker, Deputy Coroner of Jefferson County since 1973, testified that he received a call on December 21, 1976, at 12:16 p. m. to go to the 3800 block of 4th Place West. He arrived at 12:38 p. m. and saw the nude body of a white female lying nine feet off the side of the road. She was dead at that time. The body was identified to him as that of Quenette Shehane. He stated the body was in a wooded area and there were no houses in the immediate vicinity. The coroner said that he had considerable experience in investigating homicides and had an associate degree in Mortuary Science from Jefferson State College. He also had a certificate from Jacksonville State College in Death Investigation.
*1335 Mr. Parker examined the body at the scene and determined the cause of death was due to a bullet wound in the chest area. He observed other penetrating wounds on the body. He identified several photographs made at the scene where the body was found and of the body itself. The coroner ordered the body removed to Cooper Green Hospital for an autopsy and was present during the autopsy at which time he observed three penetrating wounds. Two such wounds were in the left buttocks and one to the right buttocks. The coroner identified photographs of all the wounds, injuries and abrasions noted during the autopsy, and these photographs were admitted into evidence over objections of the appellant.
Mr. Parker further testified that the autopsy was performed by Mr. Jay Glass, Pathologist Assistant with the Coroner's Office, and that he was present when Mr. Glass removed four bullets from the body. As each bullet was removed it was given to Mr. Parker who wrapped it with gauze and placed it in a separate amber plastic vial which he sealed with tape around the top and placed his initials on each vial. He stated that Dr. Henry Santina assisted Mr. Glass in performing the autopsy. Mr. Parker kept possession of the bullets removed from the body of the deceased until he delivered them to Sergeant Dave Higgins, an evidence technician with the Birmingham Police Department. They were kept in Mr. Parker's locker to which he had the only key and he delivered the four vials to Sergeant Higgins at 5:37 p. m. on the day the autopsy was performed. He stated the time of death would have been between 6:00 p. m. and 3:00 a. m.
Mr. Jay M. Glass, an employee of the Office of the Coroner, testified as to his education and experience and his qualifications were not questioned by appellant. He stated that he performed an autopsy on the body of Quenette Shehane on the afternoon of December 21, 1976 and removed four bullets from her body. Three bullets were removed from the pelvic area and one from the upper chest. Each bullet was turned over to Mr. Parker. Mr. Glass determined the cause of death to be shock and hemorrhage due to multiple gunshot wounds.
Following the death of Miss Shehane an intensive and thorough investigation was undertaken by the law enforcement agencies to ascertain the identity of her killer or killers. Several suspects were taken into custody, questioned and released. The investigation continued and finally led to the arrest of three black men who were all students at the Daniel Payne College in Birmingham at the time of the disappearance and death of Miss Shehane. These three men are appellant, Jerry Lee Jones and Wallace Norrell Thomas. They were indicted, tried, convicted and each received the death penalty. Appellant was the last of the trio to be tried and convicted but his is the first appeal to be submitted to this Court.
John Andrew Mays testified that in December of 1976 he lived with Jerry Lee Jones at 933 8th Avenue West and that this address is directly across the street from the Birmingham Southern College. He came to know appellant and Wallace Norrell Thomas through Jerry Lee Jones. He identified appellant in court. He was unable to recall specifically the date of December 20, 1976, but he vividly recalled the occasion shortly before Christmas when appellant, Jones and Thomas came to the apartment where he was living. He distinctly recalled a conversation between this trio in which they were talking about going to Birmingham Southern College and getting some ladies and taking them out. Jones asked him if he wanted to go with them and he said no, he was not interested in going. He stated that on that occasion Jones had a yellow Chevrolet automobile that was making a terrible sound and he asked Mays to drive it and see if he could determine what was making that noise. He drove the car and told Jones what he thought the trouble was that caused the motor to make such funny noises.
*1336 Mays further testified that the three men left the apartment together just as it was getting dark and that he left about thirty minutes later to go to his sister's house at 1st Center Place, North, Apartment B. He was going to stay with his sister until two days before Christmas at which time they were going to their parents' home in Lowndes County, Alabama, for the holidays. He got as many of his personal things as he could carry and started walking down Graymont Avenue when he passed the U-Totem Store which he identified as the store shown in the photograph which was State's Exhibit 15. He stated that as he came out of the alley in the vicinity of the U-Totem Store he saw a young man pushing a young lady into a car and he heard her scream. He just glanced in that direction and kept walking. He said the car in which the young lady was pushed into left, going away from him and that this car was immediately followed by a yellow car which in his best judgment belonged to Jerry Lee Jones as this car was making the same peculiar noise. He further testified that around 10:00 o'clock the next morning he returned to the apartment at 933 8th Avenue, West, to get the rest of his belongings. He found a note from appellant advising him that he had taken Mays' tennis shoes and that Mays could have his boots. Mays picked up appellant's boots and noticed they were muddy and had some red spots around the side and across the toes. He washed the mud and red spots off the boots and carried them with him to his sister's apartment.
Edward Lynn, Jr., testified that he knew appellant, Thomas and Jones. He said that on the night of the bowl game between U.C.L.A. and Alabama, either on December 20 or 21, 1976, he received a telephone call from Wallace Thomas. In response to this call he drove to a convenience store in Pratt City about 9:15 p. m. where he saw appellant, Thomas and Jones. They were standing in front of the convenience store located on Highway 78 and near Cherry Avenue. The three men got in Lynn's car and he observed their clothes were ruffled as though they had been in a fight. He saw blood on the clothes of appellant and Jones. He asked about the blood and Thomas said that appellant and Jones had had a fight at a girl's house and got blood on their clothes.
Police Officer Dennis Ray Whidbey testified he found Quenette Shehane's automobile near Cherry Avenue about 9:00 a. m. on December 21, 1976. He stated the car was a few hundred yards off Cherry Avenue. He identified State's Exhibits 18 and 19 as being photographs of Miss Shehane's car and these photographs were admitted into evidence without objection. Whidbey secured the automobile and remained at the scene until his supervisor and evidence technicians arrived.
Officer M. F. Striplin discovered the body of Miss Shehane around noon on December 21, 1976, near the 400 block of 30th Avenue West. He identified State's Exhibit 3 as being a photograph of the body. Upon discovery of the body he called the homicide unit and an evidence technician. He secured the scene and did not let anyone come near the body until the proper authorities arrived. He noticed red spots on the pavement near the place where he found the body.
Evidence technician L. E. Stricklin processed the automobile for physical evidence. He found and collected several shell casings from the ground near the automobile and found a lead projectile in the near top seat of the car. Officer Stricklin found certain articles around the automobile including packages, Christmas wrappings, Christmas paper, and a coat near the door of the car. He put these articles in the car and had the car transported to the City Shop. He followed the towed car to the shop and never lost sight of it. At the City Shop he lifted eleven latent fingerprints from this vehicle and turned them over to the Identification Bureau. He also made two lifts from the wrapping paper found around the victim's car. He further stated the automobile was found three-quarters of a mile north of *1337 Cherry Avenue and Highway 78 off Cherry Avenue. This location was approximately 200 yards from Daniel Payne College.
Officer Leonard M. Robbins, an Evidence Technician with the Birmingham Police Department, made photographs of the victim's automobile and then went to the 3800 block of 4th Place West where he observed Miss Shehane's body. At this location he collected six spent .22 caliber hulls and one live round. The following day he returned to the crime scene where he collected a brown paper bag containing two Coosa macaroon fudge cakes and a bottle of Wishbone salad dressing which had been found by Officer William D. Whisenant. Robbins lifted four latent prints from the dressing jar and turned them over to Sandra Triplett who was employed by the Police Department as a fingerprint expert.
Officer M. L. Bradley testified that, on the night of January 28, 1977, near a convenience store on 3rd Street West in the Elyton Village housing project he arrested Wallace Norrell Thomas and seized an RG-14, nickel-plated blue cylinder .22 caliber pistol. The serial number had been eradicated and the barrel had tape around it. Bradley stuck the pistol in his belt and kept it in his custody until he turned it over to Officer J. E. Rhodes who was assigned to the Evidence Technician Collecting Unit. Bradley assigned case number C 14301 to his report. He identified State's Exhibit 28 as the same pistol he had given to Officer Rhodes. Bradley further testified he had seen between 150 and 200 RG pistols but this was the only one he had ever seen with a three-inch barrel. He said that a three-inch barrel on this type of weapon is very rare.
Evidence Officer Dave L. Higgins testified that he got to his office on the morning of January 29, 1977, and found a sealed evidence bag on his desk. The door to his office was locked and he had to unlock it to gain entrance. He stated that when he opened the bag he found the RG-14 .22 caliber pistol which he identified as State's Exhibit 28. The sealed bag had the initials "J.E.R." on it and also on the cylinder of the weapon. The case number C 14301 was on the bag containing the pistol. Officer Higgins recognized the initials "J.E.R." as those of Officer J. E. Rhodes who had worked directly under him for five years but who was dead at the time of this trial. The sealed bag had a note affixed to it in the handwriting of Officer Rhodes saying, "This package contains a RG-14 with a live round under the hammer, please handle this package with care. Or, in other words, don't drop the damn thing." Higgins further testified that he did not have any other officers with the initials "J.E.R." working for him at that time. Higgins marked the weapon with his own initials, "D.L.H."
Officer Higgins test-fired the RG-14 pistol and made a ballistic comparison with the four bullets removed from the body of Miss Shehane during the autopsy. It was his opinion that the four bullets removed from the body of the victim were fired through the barrel of this particular pistol.
Mr. Bill Sutton, an employee with the Channel 6 Television Station in Birmingham, testified that he was the technician on the master control board of the station. He said that a master control log of all programs shown is maintained each day under Federal Communications Commission regulations. Mr. Sutton stated that on December 20, 1976, from 8:00 p. m. until 10:58 p. m. the Liberty Bowl game was shown on Channel 6. During his testimony he used the program log and verified the accuracy of the date and time of the game. He personally signed the log at the time of the occurrence. From his independent memory he testified that the two teams were U.C. L.A. and the University of Alabama.
Eugene Maddox, Jr., testified that he knew all three defendants in the case in which Quenette Shehane was the victim. He identified them as appellant Neal, Wallace Norrell Thomas and Jerry Lee Jones. He came to know them by his association with students at the Daniel Payne College in Birmingham. On December 21, 1976, Thomas came to his house and had several *1338 items with him, including a portable television set; that two weeks after Christmas Thomas moved into the room with him and brought the same set with him. He stated that in his best judgment it was the same television set as State's Exhibit 12. He further testified that this same television set remained in their room until some time in January when Samuel Mulkey took possession of it.
Sammy Davis Mulkey testified that, in December of 1976, he was a student at Daniel Payne College and knew as fellow students Eddie Neal, Jerry Lee Jones, Wallace Norrell Thomas and Eugene Maddox. He said that some time after Christmas of that year he got a television set from Maddox and carried it to his home in Clayton, Alabama, and kept it a day or two. Mulkey identified State's Exhibit 12 as the same TV set he had received from Maddox. He said Officer William Petty, Jr., of the Clayton Police Department, came to his house and removed the TV set.
Police Officer Petty testified that on February 9, 1977, he and Sergeant J. B. Barefield of the Birmingham Police Department went to the home of Samuel Mulkey and picked up a television set. The set was carried to the Clayton Police Department where it was sealed in a pasteboard box. Both of the officers and Samuel Mulkey signed their names on the sealed container containing the television set and placed it in the trunk of Officer Barefield's car. At appellant's trial Officer Petty identified State's Exhibit 12 as the television set which he had taken from the home of Samuel Mulkey.
Officer Barefield testified that he retained custody of this TV set and during the time it was in his possession he kept it locked in a metal box in the trunk of his car. He had the only key to this locked metal box. Barefield further testified that he turned this television set over to Evidence Technician L. E. Stricklin on February 10, 1977, and that State's Exhibit 12 was the same TV set which had been seized from Samuel Mulkey and was in the same condition as it was at the time of the seizure.
Officer Stricklin stated that at 1:31 p. m. on February 10, 1977, he took possession of a box containing a portable, black and white, Sears 12 inch television set from Officer Barefield. Stricklin took the back off the set and found the serial number to be 40204630. After dusting the set for latent prints he resealed the TV set in the metal container and deposited it in the property room of the Birmingham Police Department. Officer Stricklin stated that the set was in the same condition as it was when he turned it over to the property clerk. He identified State's Exhibit 12 as the TV set which he had received from Officer Barefield.
Mr. Frank Speigner testified that he was manager of the Home Entertainment Department of the Sears Store at Century Plaza and that he had been so employed at this store since it opened in 1974. He stated that he was the custodian of all records made daily in the regular course of business and that every day the sales of television sets and stereos are recorded in a register book by him or by someone under his supervision and directions.
Mr. Speigner said that during the regular course of business a second daily record was made of the sale of each TV set as required by Federal law. He stated the original tag is sent to Chicago each day and the photocopy becomes the permanent record of the local store. State's Exhibits 34, a page from the daily record book of 1976, and 35, a photocopy of the registration of the television set, were introduced into evidence over appellant's objections. These records reflected that, on August 20, 1976, Quenette Shehane purchased a 12 inch black and white portable television set, serial number 40204630, from the Sears store at Century Plaza.
Ms. Sandra Triplett, Senior Fingerprint Technician for the City of Birmingham, whose qualifications were not questioned, identified one of the latent prints lifted from Miss Shehane's automobile as being one from a person who identified himself to her as Wallace Norrell Thomas, one of the three co-defendants.
*1339 Mr. Lowder Yates, Criminologist with the Department of Toxicology, whose qualifications were not questioned, testified he received four bullets taken from the body of Miss Shehane, being State's Exhibits 29, 30, 31 and 32, which were turned over to him by Sergeant Higgins who was present during the autopsy. He examined and compared the bullets removed from the victim's body with those fired from State's Exhibit 28, and found they were fired from the same weapon. Mr. Yates further testified that, in his opinion, the barrel of the death weapon had not been removed.
F.B.I. Agent T. Michael Dillon testified that, on March 29, 1978, he arrested Eddie Barnard Neal in a house in Los Angeles, California, and found him in a bedroom underneath a bed. Agent Dillon advised appellant Neal of his Miranda rights orally. Prior to questioning Neal, Agent Dillon read him his constitutional rights from a form he had from the Los Angeles Police Department. Neal said he understood his rights and agreed to be interviewed. Neal told the F.B.I. Agent that he found out he had been indicted for murder in February of 1977 when he was staying with his mother in Memphis, Tennessee. He became aware of the charge against him when he received a telephone call from a girl friend in Birmingham. He told Dillon he saw some policemen entering his mother's house and he decided to leave Tennessee. The next day he got on a bus and went to Los Angeles. He further told Mr. Dillon the reason he did not surrender to the authorities was because he was afraid the Birmingham Police Department had a strong case against him.
At the time of Miss Shehane's death appellant was 18 years of age. He told Agent Dillon he had learned that Wallace Thomas and Jerry Lee Jones were convicted and given the death penalty but he did not think he would get the same punishment because of his age.
Dr. B. E. Blankenship, a psychiatrist in Birmingham, testified that he had examined John Mays in July of 1976, and that in his opinion Mays had probable incipient schizophrenic reaction. He interviewed Mays on three occasions. The initial interview lasted probably an hour and the other two interviews lasted only fifteen minutes each.
Appellant testified and denied that he killed Quenette Shehane and stated that he did not participate in her abduction. He could not recall where he was on the night of December 20, 1976, but he steadfastly maintained that he was not in a car with Thomas and Jones when it was claimed that Miss Shehane was abducted, raped, robbed and shot to death. He denied knowing anything about the television set that was allegedly taken from the automobile belonging to the victim.
On cross-examination he admitted that when he got to California he was going by the name of Eddie Ivory and that in 1977 he obtained both a temporary driver's permit and a Social Security card in the name of Eddie Ivory. He stated that he lived at three different addresses in Los Angeles. He also admitted that he was hiding under a bed when he was arrested by F.B.I. Agent Dillon.
Appellant contends the trial court erred in not granting his motion to strike Juror Ollie F. Adams because of possible bias against blacks. This juror was extensively examined on voir dire out of the presence and hearing of the jury. The record reflects the following:
"Q. Do you think you can exclude from your mind the things that you have heard about the other trial?
"A. I think so, yes, sir.
"Q. Do you believe because the other two were convicted that he must be guilty too?
"A. I don't think so.
"Q. What do you think about that, about the other two being convicted?
"A. Well, he might have a different case.
"Q. He might have
"A. Under different circumstances or something like that.

*1340 "Q. Do you understand that the other two could have been guilty and it would be your decision to decide whether he is guilty or not, if you sat on this jury, along with the other eleven people?
"A. Yes, sir.
"Q. You have referred to three people being there. You either read that or saw that on T.V.?
"A. Read it or saw it on T.V.
"Q. You understand the evidence may in fact be that there wasn't three people, there may be more or less than three people?
"A. That is possible.
"Q. Would you be able to take the evidence that you heard from the stand?
"A. I think so, yes, sir.
"Q. Do you have any reason why you wouldn't want to sit on this jury? I won't ask you what it is. Do you have any reason why you wouldn't want to sit on this jury?
"A. I don't have any reason. It might be personal because I would be home, that's all.
"Q. All of us would rather be home, I assure you. Other than that, do you have any reason?
"A. No, sir.
"Q. This involves a black man and a white female. This doesn't bother you in any way.
"A. Well, it did at one time, yes, sir.
"Q. Do you think that you could overlook that and just take the evidence that you hear from the witness stand or would that prejudice you against Eddie?
"A. That would be the only thing.
"Q. Iwe all have such prejudices. You say that would be the only prejudice that you would have?
"A. Yes, sir.
"Q. That is, a black male and a white female?
"A. Right.
"Q. Well, she was found nude
"A. Right.
"Q. according to your statement. Do you think you could overlook that if there were no other evidence connecting the Defendant with the case?
"A. If the other outweighed that, I would.
"Q. Then, you would consider that as having some weight in the case?
"A. Possibly.
"Q. The fact that he is black and she was white, and that alone?
"A. Right.
"Q. Again, I don't mean to pry, it is important. That, if I understand your statement, would sway you toward a conviction simply because of the charge. Is that a fair statement, simply because it was a black man and
"A. If he was found guilty? If the evidence proved he was guilty, that would. More so than anything.
"Q. I understand that. But I am saying, simplylet's say you were in a situation where you had a reasonable doubt of his guilt. Would the fact that he is black and she was white sway you toward that fact alone?
"A. Well, no, I don't mean to imply that. That was just one of things that I wouldwould have a possible bearing. I wouldn't
"Q. You would consider
"A. I wouldn't go all the way, no, sir.
"Q. You consider that, though, even though
"A. I would consider that, yes.
"Q. even though the Judge instructed you that that fact, that he was black and she was white, is not evidence in the case? I mean, evidence of guilt.
"A. Well
"Q. You would consider that?
"A. I would consider thatI wouldn't consider that as the difference, then.
"Q. All right. Thank you.
"THE COURT: But, you could listen to the evidence and render a fair verdict based upon the evidence?
"MR. ADAMS: Yes, sir.
"THE COURT: And, the evidence alone?
"MR. ADAMS: Yes, sir.
"THE COURT: Regardless of that?
*1341 "MR. ADAMS: Yes, sir, I would.
"THE COURT: Anything else from Mr. Adams?
"MR. DENSMORE: Thank you, Mr. Adams."
The possible prejudice of juror Adams does not place him in the category of someone with a fixed opinion.
In Fuller v. State, 269 Ala. 312, 113 So.2d 153, the Supreme Court held:
"We think it clear that the criterion for deciding whether a juror is disqualified by reason of a fixed opinion depends upon the extent, the degree, or the deepness of his impression. If the deepness of the impressions is such as to close the mind of the juror, he should be disqualified. A fixed opinion which would bias the verdict is a conviction or prejudgment, a strong or deep impression which closes the mind of the juror and combats the testimony and resists its force."
In Noah v. State, 38 Ala.App. 531, 89 So.2d 231, the Court said:
"The rule in this state is that, the extent of the examination of prospective jurors upon their voir dire rests in the sound discretion of the trial court."
In Gholston v. State, 221 Ala. 556, 130 So. 69, the Supreme Court held that it was not error to refuse to interrogate the jury panel regarding whether the jury would give a Negro the same justice as a white.
It is clear from Juror Adams' testimony that he could listen to the evidence and render a fair and impartial verdict based upon the evidence and the evidence alone. He did not have a fixed opinion as to the guilt or innocence of the defendant.
We find no abuse of the court's discretion in qualifying the jury in this case. Powell v. State, 53 Ala.App. 30, 297 So.2d 163; Holmes v. State, Ala.Cr.App., 342 So.2d 28.
Appellant contends that his constitutional rights were violated by the admission of the testimony of Mr. Bill Sutton. This witness had been employed as a technician for Channel 6 in Birmingham for 25 years. On December 20, 1976, he was in charge of the Master Control Board of Channel 6. A master control log is maintained each day under Federal Communications Commission regulations. Mr. Sutton used a copy of the program log to testify. He signed the program log and as each program was aired he personally checked it off the log. On December 20, 1976, he was on duty from 6:30 p. m. until 12:15 a. m. He personally verified the time of the Liberty Bowl game by putting his check mark on the log and he joined the ABC network for the game at 8:00 p. m. and cut away after the game at 10:58 p. m. He stated the official log bore his signature and that he personally made a copy of the log. The copy accurately reflected the original. A writing used to revive the recollections of a witness does not have to be an original where the witness has made a copy himself and can testify that the copy is correct. McCright v. State, 43 Ala.App. 292, 189 So.2d 581; Tooson v. State, 56 Ala.App. 613, 324 So.2d 327; Bennefield v. State, 281 Ala. 283, 202 So.2d 55.
The memorandum was not introduced into evidence. Mr. Sutton was cross-examined by appellant. The trial court did not err in permitting this witness to testify from his memorandum.
Appellant alleges that the admission into evidence of State's Exhibits 34 and 35, the business records of Sears, deprived him of his constitutional rights to confront witnesses against him. He also contends that the television itself, State's Exhibit 12, was erroneously admitted as evidence. We disagree.
Appellant was indicted for feloniously taking one portable Sears television set of the value of one hundred dollars, the personal property of Quenette Shehane, from her person or by putting her in such fear as unwillingly to part with the same, and said defendant in the course of said robbery did intentionally kill Quenette Shehane by shooting her with a pistol.
Miss Shehane's fiance, Ramsey Lane, was with her when the television set was purchased from Sears as a birthday present a few months before her violent death. He *1342 had seen the television set almost daily since it was purchased. He last saw the set in the victim's car the day before she disappeared. The set was traced to Wallace Thomas, a co-defendant, and from him to Eugene Maddox, then to Samuel Mulkey, then to Police Officer Petty, then to Officer Barefield and from Barefield to Officer Stricklin and from Stricklin to the courtroom during appellant's trial. There was no break in the chain of custody and possession. The officers testified the TV set was in the same condition at trial as it was at the time it was seized. Mr. Lane stated that the set was the same as the last time he had seen it in the victim's possession with only one exceptionat trial there were some black marks on it made by fingerprint powder.
In Sexton v. State, Ala.Cr.App., 346 So.2d 1177, the rule is stated to be:
"* * * To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain."
We hold the State met its burden of proving that the television set connected with the commission of the crime was not only the same one, but was in substantially the same condition as when the crime was committed. Washington v. State, Ala.Cr. App., 339 So.2d 611; Powell v. State, 47 Ala.App. 582, 258 So.2d 923; Oury v. State, 53 Ala.App. 240, 298 So.2d 661.
The reasonable inference to be drawn from the evidence in this case is that appellant entered into a joint criminal venture with two co-defendants. When the crime was carried out appellant was present, aiding and abetting, and was equally as guilty as his co-defendant who pulled the trigger of the murder weapon and who had feloniously taken the television set. The stolen set was traced directly to one of the co-defendants, Wallace Norrell Thomas. The TV set tended to show the commission of the crime and was properly admitted in evidence. Williams v. State, Ala.Cr.App., 348 So.2d 1142.
State's Exhibit 34, the record book showing the sale of the television set to Quenette Shehane, was introduced into evidence after it was identified by Mr. Frank Speigner, the manager of Sears store at Century Plaza. He was the custodian of all records made daily in the regular course of business. He testified that every day the sales of televisions and stereos are recorded in a register book by him or someone under his supervision. Mr. Speigner stated the registration was required by Federal law. The original registration tag is sent to Chicago each day and a photocopy becomes the permanent record of the local store. State's Exhibit 35, the photocopy of the registration of the television set, was introduced into evidence.
These two exhibits squarely meet the requirements of Section 12-21-43, Code of 1975, which provides:
"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of said act, transaction or event if it was made in the regular course of any business and it was the regular course of the business to make such memorandum or record at the time of such act, transaction, occurrence or event, or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term, `business' shall include a business, profession, occupation and calling of every kind."
Business records are admissible in both civil and criminal cases. McElroy's Alabama Evidence, Section 254(6) (Third Edition 1977); Patterson v. State, 262 Ala. 684, 81 So.2d 349; Pierce v. State, 42 Ala. App. 53, 151 So.2d 793.
*1343 The rights of appellant were not violated by his inability to cross-examine the person making the entry in the business record. The very essence of the admissibility of a business record is its probability of trustworthiness. The serial number on the registration tag was 40204630 and the serial number on State's Exhibit 12 was 40204630.
State's Exhibit 35, a photocopy of the registration of the television set, was admissible under Section 12-21-44, Code 1975, which deals with photocopies of business records.
Next appellant alleges that State's Exhibit 28, a .22 caliber RG pistol, was illegally admitted into evidence. We have already set forth the facts and circumstances surrounding the apprehension of co-defendant, Wallace Norrell Thomas, who had in his possession the pistol used to kill the victim and there is no necessity to repeat these facts. Appellant contends there was a break in the chain of custody of Exhibit 28 which expert testimony proved to be the death weapon.
The purpose in establishing the chain of custody is to show a reasonable probability that the pistol had not been tampered with or changed in any manner. Bell v. State, Ala.Cr.App., 339 So.2d 96; Favors v. State, Ala.Cr.App., 355 So.2d 103, cert. denied, Ala., 355 So.2d 107.
At the conclusion of a lengthy hearing on the motion to suppress the pistol the trial court ruled the pistol should be admitted into evidence. The court stated:
"THE COURT: I have read the cases that I was given by both parties and the Court is going to rule that the pistol is admissible. There is not an iota of evidence that the pistol was exchanged for another or modified in any way after Officer Bradley picked it up. There has not been shown any motive to exchange or tamper with this pistol, and I cite Bell vs. State 399 Southern 2nd 96.
"The Court is satisfied that this pistol is the same one recovered by Officer Bradley and that it is in the same condition as when recovered by Officer Bradley. Officer Bradley stated that although he had handled many guns, this particular type of .22 caliber pistol was very rare and he had never seen another one like it. Considering the nature of the article and the circumstances surrounding its preservation and custody, the Court is satisfied that identification and continuity of possession was sufficiently established to afford ample assurance of the authenticity of the article.
"And, its introduction is permitted. I cite Washington vs. State, 339 Southern 2nd 611. In Blackley [Blakely] vs. State, 344 Southern 2nd 812, and that is the case regarding the contact lens, or lens. The Court of Appeals through Judge Clark stated, to warrant the reception of an object in evidence against an objection, that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability that the object is sustained [the same?] as and not substantially different from the object as it existed at the commencement of the chain.
"And, I would cite case Sherman J. Williams vs. State, 348 Southern 2nd 1142, that was a case regarding the CB radio. So, the Court rules it is admissible and the jury, of course, may consider what weight and probative value to give the evidence."
We are in full accord with the finding by the Court on the admissibility of the pistol and his ruling is more than amply supported by the record.
Appellant contends that the testimony of Ms. Sandra Triplett was hearsay and should work a reversal of this case. We do not agree. Among Ms. Triplett's duties are the classification of fingerprints and the comparison of latent prints found at a crime scene with the known prints of a suspect from a fingerprint card. She testified she went to the Jefferson County Jail on February 7, 1977, and made prints from a black male.
From the record:
"Q. Did you ask of that individual his name?
*1344 "A. Yes, sir.
"Q. What did he tell you?
"MR. WAITES: We object on the grounds of hearsay.
"THE COURT: Overruled.
"MR. WAITES: We except.
"THE WITNESS: He stated that his name was Wallace Thomas. And, I asked him if his name was Wallace Norrell Thomas. And, he said, Yes, ma'am.
"Q. What if anything did you do after he identified himself to you?
"A. I stated that we would have to take his fingerprints and palm prints.
"Q. Did you do so?
"A. Yes, sir."
Ms. Triplett then testified that she compared a latent print from the crime scene with the palm print she had taken from Wallace Norrell Thomas and found them to be the same. She related no evidence or conversation she had with Thomas. The testimony of Ms. Triplett was merely the proper identification of the person she was fingerprinting. Clearly this was not hearsay.
Finally appellant claims the evidence was insufficient to convict him in any degree of homicide and this case should be reversed and rendered.
The law governing cases of this kind has been many times pronounced by this Court and the Supreme Court of this State. In Stokley v. State, 254 Ala. 534, 49 So.2d 284, the Supreme Court held:
"It is well established that when, by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. Such community of purpose or conspiracy need not be proved by positive testimony. It rarely is so proved. The jury is to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case. Morris v. State, 146 Ala. 66, 41 So. 274, and cases cited; Jones v. State, 174 Ala. 53, 57 So. 31; Teague v. State, 245 Ala. 339, 16 So.2d 877.
"When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not. Jones v. State, supra; Jolly v. State, [94 Ala. 19, 10 So. 606] supra; Tanner v. State, 92 Ala. 1, 9 So. 613."
Positive testimony is not necessary to prove community of purpose. It is the duty of the jury to determine whether such exists, and the extent of it, from the conduct of the parties and the testimony in the case. Morton v. State, Ala.Cr.App., 338 So.2d 423.
Circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the accused is thereby rendered admissible. DeSilvey v. State, 245 Ala. 163, 16 So.2d 183; Cronnon v. State, 56 Ala.App. 192, 320 So.2d 697.
Where the defendant fled to another state after the homicide, evidence that the flight was carried out with secrecy was admissible as tending to show a consciousness of guilt. Locklear v. State, 17 Ala. App. 597, 87 So. 708; Franklin v. State, 145 Ala. 669, 39 So. 979.
There are a number of incriminating circumstances reasonably calculated to connect appellant as a guilty participant in the *1345 shooting death of Quenette Shehane. He and two co-defendants were heard making plans to go to Birmingham Southern College and take some young ladies out. About two hours later all three defendants were picked up in the vicinity where the victim's body was found the next day. He had blood on his clothing where he was picked up with his companions. There were mud and red spots on his boots the next morning in the apartment where they were heard planning to abduct some young ladies. He took a friend's tennis shoes and left his boots in exchange. He left Birmingham shortly after the murder and went to Memphis. While in Memphis he received a telephone call from a girl friend that he had been charged with murder. He observed a number of police officers at his mother's home in Memphis where he had been living since the murder. The next day he left Memphis and went to Los Angeles, California. While in California he changed his name to Eddie Ivory. He lived in three different places in the City of Los Angeles. When he was finally apprehended on a federal flight warrant to avoid prosecution he was found hiding under the bed in the room where he was living. He told the F.B.I. agent who arrested him that he knew his co-defendants, Thomas and Jones, had received the death penalty but he didn't think he would get the same punishment because he was only 18 years of age at the time the murder was committed. He also told the agent he did not surrender to the authorities because he thought the officers in Birmingham had a strong case against him.
The verdict of the jury should be overturned with great hesitancy. Where there is legal evidence from which the jury can by fair inference find the defendant guilty this Court has no right to disturb the verdict. Daniels v. State, Ala.Cr.App., 343 So.2d 566; Smith v. State, 53 Ala.App. 27, 296 So.2d 925; Johnson v. State, 55 Ala. App. 581, 317 So.2d 548.
It is not within the province of the Court of Criminal Appeals to pass judgment on the truthfulness or falsity of conflicting testimony and a verdict rendered thereon will not be disturbed on appeal. Burns v. State, Ala.Cr.App., 346 So.2d 484; Parham v. State, Ala.Cr.App., 333 So.2d 912.
After several hours of deliberation the jury returned the following verdict:
"We the jury find the defendant guilty as charged in the indictment and fix his punishment at death by electrocution."
The jury was polled and the verdict was unanimous.
A hearing was set by the Court to hear aggravating and mitigating circumstances before imposing sentence.
At this hearing the State adduced the testimony of Police Officer Christopher Eugene Nelson who testified that in September of 1976 he was assigned to the Vice Squad. He stated that he went to Terry's Time Machine in answer to a complaint about a man entering the ladies restroom and bothering female customers. The male was identified as appellantEddie Barnard Neal. This officer and his partner identified themselves to Neal and asked him to step outside the place so they could check on his identification. They ran a check through the N.C.I.C. and learned that Neal was wanted for City escape. Neal then started running north on 17th Street. The officers pursued and caught Neal. They had a struggle with him and had to put handcuffs on him to subdue him. They placed him under arrest and put him in the patrol car at which time Neal promised to kill both officers when he got out of jail.
The State then called Officer Carl V. Garrett, Commander of the Homicide Detail, who investigated the death of Quenette Shehane. He testified that he went to Brandon, Mississippi, and picked up Jerry Lee Jones in connection with the death of Miss Shehane and returned him to Birmingham. At the time Jones was given the Miranda rights and warnings and stated that he knew and understood his rights. He was given the opportunity to talk to two attorneys in Mississippi and Garrett saw one attorney conferring with Jones in a jail cell before he was brought back to Birmingham. Jones voluntarily agreed to give the *1346 officers a statement concerning the abduction and death of Miss Shehane. His statement was tape recorded and later transcribed. Prior to the introduction of this statement at the aggravation and mitigation hearing of appellant the proper predicates were laid and the statement was read to the Court. The statement is very long and we will not set it out in this opinion.
In short, the statement involved Thomas and appellant. Jones said that Thomas picked up Miss Shehane and made her get in the back seat of her car with appellant. Appellant made her remove all her clothes and he raped her; Thomas shot her in the chest and when he stopped the car both appellant and the girl fell out of the car. The girl was not dead and appellant told Thomas, "The bitch ain't dead," whereupon Thomas shot her four or five more times; after she was dead her body was dumped in a wooded area close to the highway; Thomas took the television set and a small calculator and they abandoned the car near the Daniel Payne College. Jones denied that he raped Miss Shehane and he further stated that he did not take anything from the car.
The defense introduced the testimony of appellant's mother who testified that he had never been involved in any criminal activities; that he started to work at the age of 14 to help support the family until he joined the Job Corps.
At the conclusion of the hearing the trial court made the following written findings:
"Under the statute's mitigating factors, the court finds the following to apply:
"(a) The defendant has no significant history of prior criminal activity.
"(g) The age of the defendant at the time of the crime.
"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.
"(e) The defendant acted under ... the substantial domination of another person.
"The last two sub-sections would seem applicable just from the strong evidence of active participation on the part of Jones and Thomas, and the lack of evidence of participation by Neal. Further, Jones and Thomas were each two or three years older than Neal who was 18 at the time of the commission of the crime. From the evidence it would appear reasonable to assume that Neal's `participation was relatively minor' compared with that of Jones and Thomas, and that Neal was under their domination.
"The evidence against Neal is mainly three-fold: (1) John Mays testified that he was with Jones, Thomas, and Neal one night in December, 1976, when these three discussed going out to get a girl, but Mays does not recall exactly what night in December that this took place. (2) Eddie Lynn stated that he gave Jones, Thomas, and Neal a ride in his automobile the night that Miss Shehane disappeared, and further, that he saw blood on Neal's and Jones' shirt. (3) There was evidence that Neal left Birmingham after the crime took place, went home to Memphis, and from there to Los Angeles. From this evidence the jury found that a conspiracy existed as they were perfectly justified in doing.
"But from all the evidence:
"(1) Neal was never placed with the victim. Jones was by his confession as was brought out in his case.
"(2) Neal was never placed at the scene of the crime. Jones was by his confession.
"(3) Neal was never connected with the victim's automobile. Thomas was by his handprint, and Jones was by his confession.
"(4) Neal was never connected with the victim's television set. Thomas was, it was taken from his apartment.
"(5) Neal was never linked with the murder weapon. Thomas was, the pistol was taken from him.
"While there was sufficient evidence for the jury to find Eddie Barnard Neal guilty, there was not the depth of evidence against him which this court must insist upon for the penalty of death to be invoked.

*1347 "Therefore, the court finds that the mitigating factors outweigh the aggravating factors, and this court commutes the jury sentence of Eddie Barnard Neal from death by electrocution to life imprisonment without parole which shall be served without parole.
 /s/ Charles Nice,
 Judge"
In the light of this entire record we think this appellant was extremely fortunate to get life imprisonment without parole. He received a fair and impartial trial and he was capably represented by counsel appointed by the Court. He owes his counsel an everlasting debt of gratitude. He should not be heard to complain further about his sentence.
The judgment of conviction is, in all things, affirmed.
AFFIRMED.
TYSON, J. concurs.
DeCARLO and BOWEN, JJ., concur with opinions.
BOOKOUT, J., concurs in the result.
DeCARLO, Judge, concurring specially.
Eddie Barnard Neal was a key actor in this debauchery and murder. It was he who called the others back as they were leaving the scene, and said, "this bitch ain't dead," whereupon, Wallace Norrell Thomas shot the victim in the back three times.
In my judgment, this court under the rationale in Jerry Wayne Jacobs, Evans and Beck is endowed with the authority not only to review but to revise sentences. We are commanded to make sure they comport with other cases with like sentences.
Under these facts, I believe that the jury verdict of death should be reinstated. In comparison to other death cases coming before this court, no mitigating facts were shown in the present case that would warrant the changing of the jury's verdict of death to life without parole.
BOWEN, Judge, concurring.
I fully concur in the perceptive and thorough opinion written by Presiding Judge Harris. I also agree with Judge DeCarlo that the mitigating factors in this case do not warrant the changing of the jury's verdict of death to life without parole. While justice should be tempered with mercy, the savage and cold-blooded nature of this crime demands the ultimate punishment. However I do not believe this court has any authority to impose a sentence greater than that set by the trial judge. There is no statutory grant of such authority. The import of Jacobs v. State, 361 So.2d 607 (Ala. Cr.App.1977), affirmed, 361 So.2d 640 (Ala. 1978), and Clements v. State, 370 So.2d 708 (Ala.Cr.App.1978), reversed on other grounds, 370 So.2d 723 (Ala.1979), is that this court must independently weigh the aggravating and mitigating circumstances to determine whether they are sufficient to support a sentence of death.

ON REHEARING
HARRIS, Presiding Judge.
This case was placed on rehearing ex mero motu because the judgment entry does not conform to the verdict of the jury.
The verdict of the jury reads as follows:
"We, the jury, find the defendant guilty as charged in the indictment and fix his punishment at death by electrocution."
The judgment entry states, in part, "and having been convicted by a jury of Capital-Murder," * * * "It is therefore considered by the Court, and it is the judgment of the Court that the defendant, Eddie Barnard Neal, is guilty of Capital-Murder in accordance with the verdict of the jury in this cause, * * *". (Emphasis supplied).
It is obvious that the judgment of conviction does not conform to the verdict of the jury.
Therefore this cause is remanded to the Circuit Court of Jefferson County to make and enter a judgment in accordance with the verdict of the jury, and to forward to this Court a certified copy of the corrected judgment.
*1348 Affirmed but remanded with instructions.
All the Judges concur.